IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

MICHAEL JOSEPH CUTAIO,
     Petitioner,

vs.                              Case No.:  3:11cv538/LAC/EMT

MICHAEL D. CREWS,
     Respondent.
_____/

## REPORT AND RECOMMENDATION

This cause is before the court on Petitioner's petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (doc. 1). Respondent filed an answer and relevant portions of the state court record (docs. 21, 29). Petitioner filed a reply (doc. 26).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2; *see also* 28 U.S.C. § 636(b) and Fed. R. Civ. P. 72(b). After careful consideration of all issues raised by Petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a). It is further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

## I.     BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established by the state court record (*see* doc. 29).[1] Petitioner was charged in the Circuit Court in and for Escambia County, Florida, Case No. 2004-CF-1630, with one count of lewd of lascivious molestation (Count 1), two

---

[1] Hereinafter all citations to the state court record refer to the exhibits submitted with Respondent's answer (doc. 29). If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

counts of lewd or lascivious battery (victim over 12 but under 16 years of age) (Counts 2 and 3), two counts of contributing to the delinquency of a child (Counts 4 and 7), three counts of providing alcoholic beverages to a person under 21 years of age (Counts 5, 8, and 10), one count of lewd or lascivious conduct (Count 6), and one count of sale or delivery of drugs to a minor (Count 9) (Ex. A). A jury trial was held May 16–19, 2005 (Ex. B). The trial court granted a judgment of acquittal on Counts 5, 8, and 10, and the State nolle prossed Count 4 (*id.* at 381–89). The jury found Petitioner guilty as charged on Counts 1, 2, 3, and 9, and not guilty on Counts 6 and 7 (Ex. C). On July 28, 2005, the court sentenced Petitioner to 180 months in prison on Count 2, with pre-sentence jail credit of 72 days, 60 months in prison followed by 10 years of probation on Count 3, to run consecutively to the sentence on Count 2, and 15 years of probation on Count 9, consecutive to Count 2 (Exs. D, E).[2]

Petitioner, through counsel, appealed the judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 1D05-3898 (Ex. F). The First DCA affirmed the judgment per curiam without written opinion on September 21, 2006, with the mandate issuing October 10, 2006 (Exs. I, L). Cutaio v. State, 937 So. 2d 1101 (Fla. 1st DCA 2006) (Table). Petitioner did not seek further review.

On December 11, 2006, Petitioner filed a motion to modify sentence (Ex. M). Following a hearing, the state circuit court denied the motion in an order rendered January 18, 2007 (Ex. N).

On April 5, 2007, Petitioner filed a petition for writ of habeas corpus in the First DCA, Case No. 1D07-1860, alleging ineffective assistance of appellate counsel (Ex. O). The First DCA denied the petition on the merits on May 2, 2007, and denied Petitioner's motion for rehearing on June 29, 2007 (Exs. P, R). Cutaio v. State, 959 So. 2d 1204 (Fla. 1st DCA 2007) (Mem).

On July 30, 2007, Petitioner filed a motion for postconviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. S). In an order rendered January 14, 2008, the state circuit court struck the motion as facially insufficient, without prejudice to Petitioner's filing an amended motion "within a reasonable period of time" (Ex. T). Petitioner filed an amended motion on February 1, 2008, and supplements thereto, alleging a total of nine grounds for relief (Exs. U, X,

---

[2] Count 1 merged with Count 2, and Petitioner was sentenced only on Count 2 (Exs. D, E).

AA).  The state circuit court held a limited evidentiary hearing on some of Petitioner's claims (Ex. EE).  Petitioner was represented by counsel at the hearing (*id.*).  The court denied the Rule 3.850 motion in an order rendered September 18, 2009 (Ex. GG).  Petitioner, through counsel, appealed the decision to the First DCA, Case No. 1D10-3243 (Ex. II at 291, Ex. JJ).  The First DCA affirmed the decision per curiam without written opinion on July 9, 2010, with the mandate issuing September 20, 2010 (Exs. LL, OO).  Cutaio v. State, 43 So. 3d 693 (Fla. 1st DCA 2010) (Table).

On July 28, 2010, Petitioner filed a motion to correct illegal sentence, pursuant to Rule 3.800(a) of the Florida Rules of Criminal Procedure (Ex. PP).  The state circuit court granted the motion on February 10, 2011, and directed the clerk of court to correct the Judgment and Sentence as to Count 9 only, such that Petitioner was sentenced to 15 years in state prison on Count 9, to run concurrently with his sentence on Count 2 (Ex. QQ).  A corrected Judgment issued February 14, 2011 (Ex. RR).

On February 1, 2011, Petitioner filed another Rule 3.850 motion (Ex. SS).  The state circuit court dismissed the motion as untimely and successive on March 15, 2011 (Ex. UU).  Petitioner appealed the decision to the First DCA, Case No. 1D11-2381 (Ex. YY).  The First DCA affirmed the decision per curiam without written opinion on August 3, 2011, with the mandate issuing August 26, 2011 (Exs. AAA, DDD).  Cutaio v. State, 66 So. 3d 942 (Fla. 1st DCA 2011) (Table).

On March 14, 2011, Petitioner filed a motion for reduction or modification of sentence, pursuant to Rule 3.800(c) of the Florida Rules of Criminal Procedure (Ex. EEE).  The state circuit court denied the motion in an order rendered March 25, 2011 (Ex. FFF).

Also on March 14, 2011, Petitioner filed a motion for leave to re-file a Rule 3.850 motion (Ex. GGG).  The state circuit court denied the motion in an order rendered March 25, 2011 (Ex. HHH).  Petitioner appealed the decision to the First DCA, Case No. 1D11-2385 (Exs. LLL, MMM). The First DCA affirmed the judgment per curiam without written opinion on July 8, 2011, and denied Petitioner's motion for rehearing on July 22, 2011  (Exs. PPP, RR).  Cutaio v. State, 66 So. 3d 942 (Fla. 1st DCA 2011) (Table).

On September 29, 2011, Petitioner filed another Rule 3.800(a) motion (Ex. SSS).  The state circuit court granted the motion in part and denied it in part (Ex. TTT).  The court granted the motion to the extent that the court directed the Florida Department of Corrections to prepare a

corrected Order Placing Defendant on Probation During Portion of Sentence, to reflect that the court waived the costs of supervision (Ex. TTT).

Petitioner filed the instant federal habeas action on November 3, 2011 (doc. 1). Respondent concedes the petition is timely (doc. 21 at 38).

## II.    TRIAL EVIDENCE

A review of the evidence adduced at trial, which occurred approximately 14 months after the offenses occurred, provides context for Petitioner's claims. Officer Steve Purcell with the Escambia County Sheriff's Office, testified he is a school resource officer at Escambia County High School (Ex. B, 113–14). He testified that on March 22, 2004, he was approached by one of the school guidance counselors, stating he had a student in his office, C.N.O., stating she had to speak with him about something (*id.* at 114). Officer Purcell and two guidance counselors spoke with C.N.O. (*id.*). Officer Purcell also called for Investigator Tama Barber to report to the school and sit in on the meeting (*id.* at 116). C.N.O.'s mother also was called, and she reported to the school (*id.* at 115–16).

Tama Barber, a sex crimes and child abuse investigator with the Escambia County Sheriff's Office, conducted the interview of C.N.O. (Ex. B at 117). Investigator Barber testified she responded to the school and spoke with C.N.O. and her mother (*id.* at 120). After the interview, C.N.O. and her mother went to the hospital for a rape examination, and Investigator Barber reported to Petitioner's home (*id.* at 121). When Investigator Barber arrived, several others were present, including an evidence technician, Petitioner, Petitioner's wife, Petitioner's daughter, Deputy Rayburn, and S.L.J. (another victim) (*id.* at 122–23). Petitioner informed Investigator Barber that one of the minor girls had been accusing him of having oral sex with her, and he wanted to know "what he was looking at" (*id.* at 123). Petitioner then asked Barber if oral sex was considered "just lewd and lascivious" (*id.* at 24).

Mike Raybourn, a patrol deputy with the Escambia County Sheriff's Office, testified he was dispatched to Petitioner's home on March 22, 2004, regarding allegations of sexual abuse or sexual misconduct (Ex. B at 126–27). Deputy Raybourn testified he arrived at the scene and made contact with Petitioner (Ex. B, 128). Deputy Rabourn testified he took possession of a digital camera that belonged to Petitioner's daughter, N.L.C. (*id.* at 129).

Theresa O'Connor Seagraves testified that her daughter, C.N.O., asked her on Saturday, March 20, 2004, if she could go to a sleep over party that night at the home of N.L.C., Petitioner's daughter (Ex. B, 133–34). Ms. Seagraves told her daughter she would not permit her to go until she spoke to one of N.L.C.'s parents (*id.* at 134). Ms. Seagraves testified she spoke on the telephone with Petitioner and determined he would be at home during the sleep over (*id.* at 134–35). Ms. Seagraves testified she had not known Petitioner or his daughter prior to this date (*id.* at 139). Petitioner told Ms. Seagraves the girls would be ordering pizza and watching movies, and no boys would be present (*id.* at 134–35). Petitioner offered to pick up C.N.O. at her home and bring her to his house (*id.* at 135). Ms. Seagraves testified she first learned what happened the night of the sleep over when she received a telephone call from the school the following Monday asking her to immediately report to the school (*id.* at 136). When she arrived at the school, she attended the interview between C.N.O. and law enforcement (*id.* at 136). Ms. Seagraves testified C.N.O. had bruises on her back and knee, and after the interview, Ms. Seagraves took her to the hospital (*id.* at 137). Ms. Seagraves testified she and her husband have a liquor cabinet in the house (*id.* at 141). She testified that after the sleep over, she discovered that liquor was missing from the cabinet (*id.* at 142).

S.L.J., another victim who was 16 years old at the time of trial, testified she was a friend of N.C., Petitioner's daughter, and had slept over at her house on previous occasions (Ex. B at 145). S.L.J. testified she had had alcohol at Petitioner's house on previous sleep overs (*id.* at 145–46). She testified that on March 20, 2004, three girls spent the night at Petitioner's home (*id.* at 146). S.L.J. testified she drank more alcohol that night than she had on prior occasions (*id.* at 146). When asked who provided the liquor, S.L.J. answered: "Either we were giving it to ourselves or Major was making our drinks." (*id.* at 146).[3] S.L.J. testified Petitioner consumed alcohol, but he did not give the girls any alcohol (*id.*). She testified that during the course of the night, marijuana smoking occurred (*id.*). She testified she had been a marijuana smoker before the incident, and Petitioner, N.L.C., and Major were aware of this (*id.* at 149). S.L.J. had smoked marijuana with Major on previous occasions (*id.*). She testified that on the night of the sleep over, Major had some marijuana

---

[3] Warren Major Cross was a co-defendant who testified for the State at Petitioner's trial.

in a baggie (*id.* at 151).  S.L.J. testified she watched him pull it out of the baggie and break it up (*id.*).  She testified she smoked the marijuana with Major in the garage (*id.*).  S.L.J. testified Petitioner was in the garage at the time, but he did not smoke any marijuana (*id.* at 152).  S.L.J. denied having told her mother following this incident that Petitioner had given her a pipe to smoke (*id.* at 150).  S.L.J. testified Petitioner did not give her marijuana, nor did she smoke marijuana with him (*id.* at 155).  She testified that during the course of the evening, she was the victim of inappropriate sexual conduct (*id.* at 150).  She testified that while she was sleeping on the couch, she woke up and found Major's hands in her pants (*id.*).  She testified she slapped his hand away, and he did not bother her anymore (*id.*).  S.L.J. testified she did not recall recounting to anyone that on that night she heard Petitioner in the garage say "we are going to get these girls fucked up." (*id.*).

Leanne Waldroup, S.L.J.'s mother, testified that S.L.J. told her on Monday morning (March 22) what had occurred at the sleep over (Ex. B at 158–59).  She testified S.L.J. told her that marijuana had been consumed, and that she had participated in it (*id.* at 160).  When asked whether S.L.J. had told her who had furnished the marijuana, Ms. Waldroup responded that S.L.J. had just told her it was there and was consumed (*id.* at 160).  The prosecutor then asked Ms. Waldroup to look at a deposition she had previously given, during which she testified her daughter told her the marijuana came from Petitioner and Major (*id.* at 160–61).  Defense counsel objected to this line of questioning on the grounds that the prosecutor was either vouching for the honesty of his witness or impeaching his witness, both of which were impermissible (*id.* at 159–60).  The trial judge overruled the objection (*id.* at 160–61).  Ms. Waldroup testified from the deposition that S.L.J. had told her that Petitioner had been in the garage smoking on his pipe, and when S.L.J. walked through the garage, he handed the pipe to S.L.J. and she took a hit (*id.* at 161).

C.N.O., who was 16 years old at the time of trial, testified she knew N.L.C. from chorus group at school (Ex. B at 165).  She testified N.L.C. called her on Saturday the 20th to invite her to the sleep over (*id.* at 164–66).  C.N.O. testified she called her mother to ask permission, and her mother told her she would have to speak to one of the parents (*id.* at 166).  C.N.O. testified she had never been to N.L.C.'s house or met Petitioner prior to this occasion (*id.*).  She testified that after a 3-way telephone conversation between her, her mother and Petitioner, she was permitted to go to the sleep over (*id.* at 166–67).  C.N.O. testified that when her mother got off the phone, she (C.N.O.)

continued conversing with N.L.C., and Petitioner came on the phone and asked C.N.O. to bring alcohol, specifically vodka, when she came to his house (Ex. B at 167). C.N.O. brought 2–3 liquor bottles from her house (*id.* at 168). C.N.O. testified she was picked up and driven to the sleep over by a person she assumed to be Petitioner, but later learned was Major Cross (*id.* at 168–69). She testified when she arrived at Petitioner's house, she saw Petitioner and S.L.J. smoking marijuana in the garage (*id.* at 170). C.N.O. testified Petitioner held out the marijuana and offered it to C.N.O., but she declined (*id.* at 171). She testified that after she had been there awhile, Petitioner approached her and handed her what looked like a test tube and told her it was a popsicle and to try it (*id.* at 172–73). C.N.O. testified she did so and could taste the alcohol in it (*id.* at 174). She testified that during the course of the evening, Petitioner and Major provided her with more alcohol, which she consumed (*id.* at 175). She testified that at one point, Petitioner sent Major and S.L.J. to the liquor store, and they came back with a bag full of liquor bottles (*id.* at 176). She testified that later in the evening, Petitioner told the girls to change into their bathing suits to go "mud riding" or "mudding," which was riding into the mud in a truck (*id.* at 177). C.N.O. testified she changed clothes into a spaghetti strapped t-shirt, a bathing suit top, and a pair of shorts (*id.* at 178). She testified she first went "mud riding" with Major and L.M.C. (another victim) (*id.* at 178). C.N.O. testified Major made L.M.C. sit on his lap and drive (*id.* at 179). She testified she also sat on Major's lap and drove (*id.*). C.N.O. testified that on a second trip of "mud riding," she went out with Petitioner, L.M.C., and Major (*id.* at 179–80). She testified she sat on Major's lap and drove (*id.* at 180). C.N.O. testified that on this second trip, Major stopped the truck, picked her up, "threw" her in the back of the pickup truck, and had sex with her (*id.* at 180–82). C.N.O. testified Petitioner and L.M.C. were in the cab of the pickup truck, and at one point, Petitioner got out of the cab and asked Major if he had any condoms (*id.* at 181). C.N.O. testified she had consumed so much alcohol by that time, she did not understand what was going on (*id.* at 182). She testified she had never had sex before (*id.*). C.N.O. testified that when they returned to the house, Petitioner fixed her another drink, and proposed a contest to see if she could drink the drink faster than he could eat a piece of pizza crust (*id.* at 183). She testified she drank the drink before he held the pizza crust to his mouth (*id.*). C.N.O. testified Petitioner and Major then left to go to store, and when they returned, they told her and L.M.C. they had to get back in the truck and go "mud riding" again (*id.* at 183–84). C.N.O.

testified she and L.M.C. asked N.L.C., Petitioner's daughter, to go with them, but Petitioner would not allow his daughter to go (*id.* at 184). C.N.O. testified she sat on Major's lap, and L.M.C. sat on Petitioner's lap (*id.*). She testified they drove toward the woods again and stopped, and Major picked her up and threw her in the back of the pickup truck again and had sex with her again (*id.* at 185). C.N.O. testified Major pulled off her shorts and underwear (*id.*). She testified after they had sex, L.M.C. tried to get out of the cab of the pickup truck and climb down the side, and asked what they were doing, but Petitioner pulled her back into the cab and locked the doors (*id.* at 185–86). C.N.O. testified Petitioner then got out of the cab and stated L.M.C. wanted to switch partners (*id.* at 186). She testified Major then got into the cab of the truck with L.M.C., and Petitioner came to the back of the truck, put his hands on her legs, and tried to push himself on top of her (*id.*). She testified that by this time, she was starting to think clearly again, and she pushed Petitioner off, saying "What are you doing? You are married." (*id.* at 186–87). She told him he could get in a lot of trouble for this, and he responded, "But we are not going to, are we? Bad things will happen, and we will go to jail for a long time." (*id.* at 187). C.N.O. testified she interpreted this statement as a threat (*id.*). She testified Petitioner never had sex with her (*id.*). C.N.O. testified the next thing she remembered was being back at the house on the couch (*id.*). She testified she woke up and Major was having sex with her again (*id.*). C.N.O. testified that when she woke up, L.M.C. came into the room with C.N.O.'s camera and started taking pictures (*id.* at 188). She testified the next morning, Petitioner took the girls to the beach and told them to get in the water (*id.*). C.N.O. testified S.L.J. was dropped off at home before the beach, because she was feeling sick (*id.*). C.N.O. testified she discussed the incidents of the previous night with L.M.C. at the beach, and L.M.C. told her they could never tell anyone because Petitioner and his wife would get divorced, and Petitioner's daughter would hate them (*id.* at 189). C.N.O. testified she waited until the next day, Monday, to tell school officials (*id.* at 189–90). She testified she had bruises and bumps on her back and bruises on her legs from being in the truck (*id.*). C.N.O. testified she told N.L.C., Petitioner's daughter, what happened just prior to talking to law enforcement (*id.* at 190).

L.M.C., who was 16 years old at the time of trial, testified she knew Petitioner through N.L.C. (Ex. B at 215). She testified she had been to Petitioner's home approximately six times prior to the instant incident (*id.* at 215). L.M.C. testified she had seen Petitioner give alcohol to his

daughter and her friends (*id.* at 215–16). L.M.C. testified she had consumed alcohol at Petitioner's home on these prior occasions (*id.* at 220). On the night of the sleep over, March 20, 2004, L.M.C. arrived at Petitioner's home at approximately 8:00 p.m. (*id.* at 217). She testified Major Cross had picked her up at her home and brought her to Petitioner's home (*id.*). She testified Petitioner and Major were making drinks for the girls (*id.* at 220–21). L.M.C. testified that on a scale of 1 through 10, her state of intoxication was "like 9-and-a-half" (*id.* at 222). L.M.C. testified she saw Petitioner, Major, S.L.J. and N.L.C. smoking marijuana in the garage (*id.*). She testified she did not recall whether they offered her any (*id.*). She testified that later that evening, she went "mud riding" approximately five times (*id.* at 223). She testified the first time was with Major and S.L.J.; the second time was with Major and N.L.C., Petitioner's daughter; and the third time was with Major and C.N.O. (*id.* at 222–24). She testified the fourth "mud ride" was with Major, Petitioner and C.N.O. (*id.* at 225). She testified she was wearing a bathing suit top and yellow shorts and underwear (*id.* at 226). She testified that at one point, they came to a stop, and Major took C.N.O. to the back of the truck (*id.* at 227). She testified she and Petitioner were in the front of the truck (*id.*). L.M.C. testified Petitioner started kissing her and touching her vaginal area under her clothing (*id.* at 228). L.M.C. testified she felt like she was blacking out (*id.* at 229). She testified Petitioner got out of the truck and put on a condom and came back and tried to put his penis inside of her vagina while sliding her shorts over (*id.* at 228). After that, he pushed her shorts aside and placed his tongue on her vagina, penetrating it (*id.* at 230). L.M.C. testified Petitioner then asked her to touch his penis, and she did (*id.* at 230–31). She testified he asked her to give him oral sex, but she did not, and "just shook [her] head and backed off." (*id.* at 231). L.M.C. testified when they got back to the house, Petitioner and Major went to the store to buy condoms (*id.* at 231–32). She testified that while they were gone, she and C.N.O. talked in the bathroom, and C.N.O. told her that Major had taken her tampon out (*id.* at 232). L.M.C. testified when Petitioner and Major returned, they took her and C.N.O. back out on the fifth "mud ride" (*id.* at 232–33). She testified before they left, she tried to convince N.L.C. to go, but Petitioner and Major would not allow her to go (*id.* at 232). L.M.C. testified when they arrived in the woods, Major and C.N.O. again went to the back of the truck, and she and Petitioner were in the front (*id.* at 233). L.M.C. testified Petitioner got on top of her and started humping her and told her to "just grind back" (*id.* at 234). L.M.C. told

Petitioner she was scared they were going to get in trouble, and she "didn't want to get hurt," and Petitioner responded they were already in trouble (*id.*). L.M.C. testified Petitioner penetrated her with his penis (*id.* at 235). She testified she felt physical pain, and Petitioner told her, "We will have to stretch it out." (*id.*). L.M.C. testified she did not consume any more alcohol after the fifth "mud ride" (*id.* at 236). She testified she fell asleep in N.L.C.'s room and then later woke up and took pictures in the living room (*id.*). L.M.C. testified the next day, she and C.N.O. talked about the night before, and they did not know if they should tell anyone (*id.* at 237). She testified she did not want to ruin Petitioner's daughter's life (*id.*). L.M.C. testified she was able to take police back to the locations in the woods where the acts occurred (*id.* at 239). L.M.C. testified she had never had sex prior to this incident (*id.*).

Investigator Barber returned to the witness stand and testified that L.M.C. was able to take officers to two locations in the woods where the sex acts occurred (Ex. B at 270, 277). She testified they located a black condom, a black condom wrapper, and a used tampon at one location, and an orange condom at a second location (*id.* at Ex. B, 269–71, 273–74, 277–80). Investigator Barber testified officers also collected the shorts and panties worn by L.M.C. that night (*id.* at 282–83). She also took a buccal swab from L.M.C. (*id.* at 285). A buccal swab from Petitioner was also admitted into evidence (*id.* at 292–93).

Ann Marie Dowden, a crime lab DNA serologist with the Florida Department of Law Enforcement, testified she performed DNA testing on the items in evidence (Ex. B at 293–325). She testified she identified semen on the black condom (*id.* at 307). She testified she obtained a DNA profile from a short tandem repeats ("STR") analysis for the sperm portion of the black condom, and Petitioner matched the DNA profile from the sperm portion of the condom (*id.* at 300–08). She testified the DNA profile obtained from the non-sperm portion of the condom also matched Petitioner (*id.* at 308). Ms. Dowden testified that the chance that another individual would have the same profile as found on the sperm portion of the condom and the non-sperm portion was 1 in 490 trillion Caucasians (*id.* at 308–09). She testified she also tested the panties worn by L.M.C. (*id.* at 310). She testified that with regard to the non-sperm portion of the panties, there was a mixture of DNA in that portion of 2 or more people, consistent with DNA from 2 people (*id.*). She testified there was a majority of DNA from one person and a smaller amount from a second person (referred

to as the "minor donor") (*id.*). Dowden testified Petitioner was included as a possible donor to the smaller amount of DNA found in the panties (*id.*). She testified that the frequency of occurrence of this minor donor profile appearing in the population is 1 out of every 120,000 Caucasians (*id.*). Dowden testified that with regard to the sperm portion in L.M.C.'s panties, Major Cross matched the sperm portion (*id.* at 311). Ms. Dowden testified she tested the tampon, and it matched C.N.O's DNA profile (*id.* at 314). She testified the sperm portion of the tampon matched Major Cross's DNA profile (*id.* at 315).

Warren Major Cross, who 27 years old at the time of trial, testified he and Petitioner had been friends for 12 years (Ex. B at 359). He testified that on March 20, 2004, Petitioner asked him to pick up L.M.C. and C.N.O. and bring them to his (Petitioner's) house (*id.* at 361). Cross testified he had previously met L.M.C. but did not know C.N.O. (*id.* at 362). He testified that when arrived at Petitioner's house, the girls went inside, and he and Petitioner worked on a car in the garage (*id.* at 365). Cross testified he did not smoke marijuana that day (*id.* at 364). He testified he was drinking Tequila, and Petitioner was drinking beer and Seagrams (*id.* at 365). Cross testified that at no time did he see the girls drinking alcohol, and at no time did either he or Petitioner make drinks for them (*id.* at 366). Cross testified they went mud riding at least four times that evening (*id.* at 368–70). He testified that during one ride, he went with Petitioner, L.M.C., and C.N.O. (*id.* at 372). Cross testified he considered himself "pretty intoxicated" at that point (*id.* at 373). Cross testified the girls and Petitioner "seemed fine" (*id.*). He testified that at one point, they stopped the truck, and Petitioner and L.M.C. were in the front while he was in the back of the truck sitting with C.N.O. (*id.* at 374–75). He testified he never heard Petitioner ask if he had any condoms, nor did he ever hear Petitioner say that L.M.C. wanted to switch partners (*id.* at 374). When asked whether he had sex with C.N.O. that night, Cross responded: "Not that I recall. The evidence is certainly there to suggest that." (*id.* at 375). When asked how he could not be able to recall something like that, Cross responded: "I was extremely intoxicated." (*id.*). Cross testified he had not been promised anything by the State in return for his testimony (*id.* at 367). On cross-examination, defense counsel asked Cross whether he had ever put any kind of "knock-out drops" in Petitioner's drink to "mess him up," and Cross responded, "No, sir." (*id.* at 378).

The first witness called by the defense was N.L.C., Petitioner's daughter. She was 16 years old at the time of trial (Ex. B at 394). She testified she had a sleep over at her house on March 20, 2004, which was attended by S.L.J., L.M.C., and C.N.O. (*id.* at 395). She testified her mother was out of town at the time (*id.*). N.L.C. testified Petitioner and Mr. Cross were present (*id.*). She testified C.N.O. and Cross brought alcohol to the party, and everyone was drinking it (*id.* at 396–97). N.L.C. testified her father was not aware that the girls were drinking, and he never made any of the girls drinks (*id.*). She testified Cross made drinks for the girls, and they made drinks for themselves (*id.* at 397–98). N.L.C. testified her father was in the garage the entire evening, and Cross took him mixed drinks (*id.* at 397). She testified Cross brought marijuana to the house, and she and S.L.J. smoked it in her room (*id.* at 399–400). She testified S.L.J. told her she smoked it with Cross outside the house (*id.*). N.L.C. testified that the first time she heard that something inappropriate occurred that evening was the following Monday, when C.N.O. told her (*id.* at 400). She testified she asked L.M.C. if anything inappropriate happened, and L.M.C. told her she could not remember anything and to ask C.N.O. what happened (*id.* at 401). N.L.C. testified she went on one "mud ride" that night (*id.* at 400). She testified that later that night, after her father had gone to bed, all of the girls were in her bedroom, and C.N.O. said she was going to go into the other room and "'F' with Major's head" (*id.* at 402–03). N.L.C. testified C.N.O. then left the bedroom (*id.* at 403). She testified approximately 15 minutes later, she and the other girls went into the other room and saw C.N.O. on top of Cross, straddling him (*id.*). She testified they took pictures of them (*id.*). N.L.C. testified that by that time the girls were "pretty much" sober (*id.* at 410). She then clarified that she was sober, but she did not know if the others were (*id.* at 411). She admitted she told police that L.M.C. and C.N.O. begged her to go mud riding (*id.* at 413–14). When asked to described her father's behavior that night, N.L.C. testified, "At one point, he was passed out, out in the garage in a chair. And then another time, he was just kind of up and kind of goofy hyper, and then he just kind of laid back down and mellowed out again." (*id.* at 418). She testified he passed out "off and on" throughout the night (*id.* at 418–20). N.L.C. testified she saw Cross with his hand up S.L.J.'s shirt at one point in the evening, but she ignored it, because she "didn't care" (*id.* at 422–24).

Kimberly Warner, a registered nurse with a local hospital, testified she was present when a doctor examined L.M.C. on March 23, 2004 (Ex. B at 427). She testified that according to the

examination record prepared by the doctor, he did not observe any injuries on L.M.C.'s thighs, nor did he observe any trauma, including redness, tears, or bruises, to her vaginal area (*id.* at 430). She also testified L.M.C. could not "tolerate" a pelvic examination with even the smallest speculum, and it was possible that her inability to tolerate it was due to pain or trauma (*id.* at 429–31)

Marcus Monn, N.L.C.'s boyfriend, testified he was at Petitioner's house for approximately 30 minutes on March 20, 2004 (Ex. B at 449–55). He testified he observed Mr. Cross with a small brown vial or medicine bottle with liquid in it and a small black "squeezie" on the top (*id.* at 455). Monn testified he observed the vial on the counter, and then Cross put it in his pocket (*id.* at 456). Mr. Monn testified he did not see Cross put any of the liquid into any drinks (*id.* at 455). Monn testified that Petitioner came into the house from the garage and told him it was time for him to go (*id.* at 460). Monn acknowledged that in his deposition he stated Petitioner told him to go because "it was going to be ladies night" (*id.* at 461).

Mark Kerr testified he fished with Petitioner and Mr. Cross during the afternoon of March 20, 2004 (Ex. B at 464–66). He testified that at the end of the fishing trip, he and Cross walked to Cross's truck while Petitioner was still fishing (*id.* at 468). Kerr testified he saw Cross drop two drops of liquid from a small brown vial into a brown bottle of beer, and Cross said Petitioner "was going to get pretty F'd up and probably won't remember much" (*id.* at 469). On further examination, Kerr admitted he did not recall the exact words Cross used, but he understood him to mean that Petitioner was not going to be in a sober state of mind (*id.* at 470–71, 474). Kerr testified he never saw Petitioner actually drink from the brown beer bottle (*id.* at 475).

III.    STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States. As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and

Effective Death Penalty Act of 1996 (AEDPA). Pub.L. 104-132, § 104, 110 Stat. 1214, 1218–19.

In relevant part, section 2254(d) now provides:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review in <u>Williams v. Taylor</u>, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[4]  The appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court.  Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States."  Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

---

[4] Unless otherwise noted, references to <u>Williams</u> are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring); Ramdass v. Angelone, 530 U.S. 156, 120 S. Ct. 2113, 2119–20, 147 L. Ed. 2d 125 (2000). In employing this test, the Supreme Court has instructed that on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." Lockyer v. Andrade, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case." Neelley v. Nagle, 138 F.3d 917, 923 (11th Cir. 1998), *overruled on other grounds by* Parker v. Head, 244 F.3d 813, 835 (11th Cir. 2001).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" Lockyer, 538 U.S. at 73 (quoting Williams, 529 U.S. at 405–06). The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002) (quoting Williams, 529 U.S. at 405–06). If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim. Moreover, where there is no Supreme Court precedent on point, the state court's conclusion cannot be contrary to clearly established federal law. *See* Henderson v. Campbell, 353 F.3d 880, 890 n. 15 (11th Cir. 2003).

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases. The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable." Williams, 529 U.S. at 409. Whether a State court's decision was an

unreasonable application of a legal principle must be assessed in light of the record the court had before it.  Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 2737–38, 159 L. Ed. 2d 683 (2004) (per curiam); *cf.* Bell v. Cone, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843, 1851 n.4, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law).  An objectively unreasonable application of federal law occurs when the State court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001).  "In determining whether a state court's decision represents an unreasonable application of clearly established federal law, a federal court conducting habeas review 'may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable.'"  Gill v. Mecusker, 633 F.3d 1272, 1287 (11th Cir. 2011) (quoting Williams, 529 U.S. at 411) (citing Harrington v. Richter, — U.S. —, 131 S. Ct. 770, 786–87, 178 L. Ed. 2d 624 (2011)).  The AEDPA's "unreasonable application" standard focuses on the state court's ultimate conclusion, not the reasoning that led to it.  *See* Gill, *supra* at 1291 (citing Harrington, 131 S. Ct. at 786).  Under § 2254(d), a habeas court must determine what arguments or theories supported or could have supported the state court's decision, and then ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court.  *See* Harrington, 131 S. Ct. at 786; *see also* Gill, *supra,* at 1292 (the federal district court may rely on grounds other than those articulated by the state court in determining that habeas relief was not warranted, so long as the district court did not err in concluding that the state court's rejection of the petitioner's claims was neither an unreasonable application of a Supreme Court holding nor an unreasonable determination of the facts).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  The Supreme Court has clarified that: "a decision adjudicated on the merits

in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); see, e.g., Miller-El, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); Jones v. Walker, 469 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact."). The "unreasonable determination of the facts" standard is only implicated to the extent that the validity of the state court's ultimate conclusion is premised on unreasonable fact finding. See Gill, 633 F.3d at 1292. A petitioner is not entitled to relief unless he demonstrates by clear and convincing evidence that the record reflects an insufficient factual basis for affirming the state court's decision. Id.

Only if the federal habeas court finds that the petitioner satisfied AEDPA, and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims. See Panetti v. Quarterman, 531 U.S. 930, 953, 127 S. Ct. 2842, 2858, 168 L. Ed. 2d 662 (2007); Jones, 469 F.3d 1216 (same). The writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a).

## IV.     EXHAUSTION AND PROCEDURAL DEFAULT

It is a long-standing prerequisite to the filing of a federal habeas corpus petition that the petitioner have exhausted available state court remedies, 28 U.S.C. § 2254(b)(1),[5] thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." Duncan v. Henry, 513 U.S. 364, 365, 115 S. Ct. 887, 888, 130 L. Ed. 2d 865 (1995) (quoting Picard v. Connor, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation omitted)). To satisfy the exhaustion requirement, the petitioner must "fairly present" his claim in each appropriate state court, alerting that court to the federal nature of the claim. Duncan, 513 U.S. at 365–66; O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999); Picard, 404 U.S. at 277–78.

The Supreme Court has provided lower court with guidance for determining whether a habeas petitioner has met the "fair presentation" requirement. In Picard v. Connor, the Court held that, for purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief. 404 U.S. at 277. In announcing that "the substance of a federal habeas corpus claim must first be presented to the state courts," id. at 278, the Court rejected the contention in that case that the petitioner satisfied the exhaustion requirement by presenting the state courts only with the facts necessary to state a claim for relief.

Additionally, the Court has indicated that it is not enough that a petitioner make a general appeal to a constitutional guarantee as broad as due process to present the "substance" of such a claim to a state court. Anderson v. Harless, 459 U.S. 4, 103 S. Ct. 276, 74 L. Ed. 2d 3 (1982). In Anderson, the habeas petitioner was granted relief by the Sixth Circuit Court of Appeals on the

---

[5] Section 2254 provides, in pertinent part:

(b)(1)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–
          (A)  the applicant has exhausted the remedies available in the courts of the State; or
          (B) (i)  there is an absence of available State corrective process; or
              (ii)  circumstances exist that render such process ineffective to protect the rights of the applicant.
. . . .
(c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

ground that a jury instruction violated due process because it obviated the requirement that the prosecutor prove all the elements of the crime beyond a reasonable doubt.  459 U.S. at 7 (citing Sandstrom v. Montana, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979)).  The only manner in which the habeas petitioner cited federal authority was by referring to a state court decision in which "the defendant . . . asserted a broad federal due process right to jury instructions that properly explain state law."  Anderson, 459 U.S. at 7 (internal quotation marks omitted).  The Court expressed doubt that a defendant's citation to a state-court decision predicated solely on state law was sufficient to fairly apprise a reviewing court of a potential federal claim merely because the defendant in the cited case advanced a federal claim.  Id., 459 U.S. at 7 & n.3.  Furthermore, the Court clarified that such a citation was obviously insufficient when the record satisfied the federal habeas court that the federal claim asserted in the cited case was not the same as the federal claim on which federal habeas relief was sought.  Id.

Years later, the Supreme Court readdressed the "fair presentation" requirement in Duncan v. Henry, 513 U.S. 364.  The Duncan Court strictly construed the exhaustion requirement so as to mandate that, if state and federal constitutional law overlap in their applicability to a petitioner's claim, the petitioner must raise his issue in terms of the applicable federal right in state court in order to obtain federal review of the issue.[6]  The Supreme Court explained,"[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal, but in state court."  Duncan, 513 U.S. at 365–66.  More recently, the Supreme Court again focused upon the requirement of "fair presentation," holding that "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so."  Baldwin v. Reese, 541 U.S. 27, 124 S. Ct. 1347, 1351, 158 L. Ed. 2d 64 (2004).  In Baldwin, the Supreme Court recognized that "[a] litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by

_____

[6] The petitioner in Duncan raised a federal due process claim in his habeas petition, but had raised only a state constitutional claim in his state appeal.  Presented with a state constitutional claim, the state court applied state law in resolving the appeal.  513 U.S. at 366.

citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'" *Id.*, 541 U.S. at 32. This language, while not part of the Court's holding, provides helpful instruction. With regard to this language, the Eleventh Circuit explained in McNair v. Campbell, 416 F.3d 1291 (11th Cir. 2005):

> If read in a vacuum, this dicta might be thought to create a low floor indeed for petitioners seeking to establish exhaustion. However, we agree with the district court that this language must be "applied with common sense and in light of the purpose underlying the exhaustion requirement[:] 'to afford the state courts a meaningful opportunity to consider allegations of legal error without interference from the federal judiciary.'" McNair [v. Campbell], 315 F. Supp. 2d at 1184 (quoting Vasquez v. Hillery, 474 U.S. 254, 257, 106 S. Ct. 617, 620, 88 L. Ed. 2d 598 (1986)). This is consistent with settled law established by the Supreme Court. . . . We therefore hold that "'[t]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record.'"

416 F.3d at 1302-03 (citations omitted).[7]

The Eleventh Circuit, prior to Duncan, had broadly interpreted the "fair presentation" requirement. After Duncan, however, the Eleventh Circuit has taken a more narrow approach. For example, in Zeigler v. Crosby, the court held that the habeas petitioner failed to "fairly present" his juror misconduct claims to the state courts where his brief to the state appellate court did not refer to the federal constitutional issues raised in his federal habeas petition, and none of the cases cited in his direct appeal discussed the United States Constitution. 345 F.3d 1300, 1307 (11th Cir. 2003). The Eleventh Circuit specifically noted that the section of the petitioner's appellate brief which dealt with juror misconduct contained the words: "Appellant was denied due process and a fair trial. . . .," which could be interpreted as asserting a fair trial claim under the Due Process Clause of the Florida Constitution. *Id.* at 1308 n.5. The only cases cited in the discussion of the issue in petitioner's state appellate brief were state supreme court cases that made no mention of the United States Constitution and cited no federal cases. The court concluded that petitioner's "[c]ursory and

---

[7] In his initial brief before the Court of Criminal Appeals, McNair cited one federal case in a string citation containing other state cases, and in a closing paragraph in his argument that extraneous materials were considered by the jury during deliberations, stated that there was a violation of his rights "protected by the Fifth, Sixth, Eighth[,] and Fourteenth Amendments to the United States Constitution, the Alabama Constitution[,] and Alabama law." McNair v. Campbell, 416 F.3d 1291, 1303 (11th Cir. 2005). The court found that these references to federal law were not sufficient to meet the fair presentment requirement and noted that it was important that the petitioner had never mentioned the federal standards regarding extraneous materials in his brief, but relied on state law for his arguments. *Id.*

conclusional sentence (unaccompanied by citations to federal law), . . . did not present to the Florida courts the federal claim asserted to us." *Id.*

An issue that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, that is, procedurally barred from federal review. *See* O'Sullivan, 526 U.S. at 839–40, 848; Bailey v. Nagle, 172 F.3d 1299, 1302–03 (11th Cir. 1999). This court will also consider a claim procedurally defaulted if it was presented in state court and rejected on the independent and adequate state ground of procedural bar or default. *See* Coleman v. Thompson, 501 U.S. 722, 734–35 & n.1, 111 S. Ct. 2546, 2555 & n.1, 115 L. Ed. 2d 640 (1991); Caniff v. Moore, 269 F.3d 1245, 1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally defaulted under state law cannot be addressed by federal courts."); Chambers v. Thompson, 150 F.3d 1324, 1326–27 (11th Cir. 1998) (applicable state procedural bar should be enforced by federal court even as to a claim which has never been presented to a state court); *accord* Tower v. Phillips, 7 F.3d 206, 210 (11th Cir. 1993); Parker v. Dugger, 876 F.2d 1470 (11th Cir. 1990), *rev'd on other grounds*, 498 U.S. 308, 111 S. Ct. 731, 112 L. Ed. 2d 812 (1991). In the first instance, the federal court must determine whether any future attempt to exhaust state remedies would be futile under the state's procedural default doctrine. Bailey, 172 F.3d at 1303. In the second instance, a federal court must determine whether the state's procedural default ruling rested on adequate state grounds independent of the federal question. *See* Harris v. Reed, 489 U.S. 255, 109 S. Ct. 1038, 1043, 103 L. Ed. 2d 308 (1989). The adequacy of a state procedural bar to the assertion of a federal question is itself a federal question. Lee v. Kemna, 534 U.S. 362, 122 S. Ct. 877, 885, 151 L. Ed. 2d 820 (2002). The adequacy requirement has been interpreted to mean that the rule must be "firmly established and regularly followed," Siebert v. Allen, 455 F.3d 1269, 1271 (11th Cir. 2006), that is, not applied in an "arbitrary or unprecedented fashion," Judd v. Haley, 250 F.3d 1308,1313 (11th Cir. 2001), or in a manifestly unfair manner. Ford v. Georgia, 498 U.S. 411, 424–25, 111 S. Ct. 850, 858, 112 L. Ed. 2d 935 (1991); Upshaw v. Singletary, 70 F.3d 576, 579 (11th Cir. 1995).

The Eleventh Circuit has set forth a three-part test to determine whether a state court's procedural ruling constitutes an independent and adequate state rule of decision. Judd v. Haley, 250 F.3d 1308, 1313 (11th Cir. 2001). First, the last state court rendering judgment must clearly and

expressly state it is relying on state procedural rules to resolve the federal claim.[8]  Second, the state court's decision on the procedural issue must rest entirely on state law grounds and not be intertwined with an interpretation of federal law.  Third, the state procedural rule must be adequate.  *Id.*  The adequacy requirement has been interpreted to mean the rule must be firmly established and regularly followed, that is, not applied in an arbitrary or unprecedented fashion.  *Id.*

To overcome a procedural default such that the federal habeas court may consider the merits of a claim, the petitioner must show cause for the default and prejudice resulting therefrom or a fundamental miscarriage of justice.  Tower, 7 F.3d at 210; Parker, 876 F.2d 1470.  "For cause to exist, an external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim."  McCleskey v. Zant, 499 U.S. 467, 497, 111 S. Ct. 1454, 1472, 113 L. Ed. 2d 517 (1991) (quoting Murray v. Carrier, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645, 91 L. Ed. 2d 397 (1986)).  To satisfy the miscarriage of justice exception, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent."  Schlup v. Delo, 513 U.S. 298, 327, 115 S. Ct. 85, 130 L. Ed. 2d 808 (1995).  "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him."  Schlup, 513 U.S. at 327.  Further:

> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare.  To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.

*Id.*

Within this framework, the court will review Petitioner's claims.

## V.    PETITIONER'S CLAIMS

A.    Ground One:  "The Petitioner was denied effective assistance of counsel guaranteed by the 5th, 6th, and 14th Amendment [sic] of the United States Constitution when appellate counsel rendered ineffective [sic] by failing to raise the claim that the trial court erred where evidence was insufficient for a conviction of sales and delivery of cannabis to a minor."

---

[8] The federal court should honor the procedural bar even if the state court alternatively reviewed the claim on the merits.  Marek v. Singletary, 62 F.3d 1295, 1302 (11th Cir. 1995); Alderman v. Zant, 22 F.3d 1541 (11th Cir. 1994).

Petitioner contends appellate counsel was ineffective for failing to argue on direct appeal that the trial court erred by denying defense counsel's motion for judgment of acquittal ("JOA") as to Count 9, sale or delivery of cannabis to a minor (doc. 1 at 8–9).[9]  Petitioner asserts S.L.J., the victim of Count 9, testified she did not smoke or receive cannabis from Petitioner (*id.*).  Petitioner further asserts trial counsel preserved this issue for appeal by arguing it in a motion for JOA, and the trial court expressed doubt as to whether the evidence was sufficient to establish the sale or delivery element of the charge, but eventually denied the motion for JOA (*id.*).  Petitioner contends appellate counsel should have raised this issue on appeal (*id.*).

Respondent concedes Petitioner exhausted this claim in the state courts (doc. 21 at 47).  Respondent contends the First DCA's denial of this claim was not contrary to or an unreasonable application of clearly established federal law (*id.* at 48–55).

1.      Clearly Established Federal Law

The proper standard for evaluating a claim of ineffective assistance of appellate counsel is the standard set forth in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).  *See* Smith v. Robbins, 528 U.S. 259, 285,120 S. Ct. 746, 764, 145 L. Ed. 2d 746 (2000) (citation omitted).  The two components of an ineffectiveness claim under Strickland are performance and prejudice, and if an insufficient showing is made as to one, the court need not address the other.  Strickland, 466 U.S. at 697.  The focus of inquiry under the performance prong of the Strickland standard is whether counsel's assistance was "reasonable considering all the circumstances." *Id.* at 691.  Appellate counsel who file a merits brief need not (and should not) raise every nonfrivolous claim but, rather, may select from among them in order to maximize the likelihood of success of on appeal.  Jones v. Barnes, 463 U.S. 745, 753–54, 103 S. Ct. 3308, 3314, 77 L. Ed. 2d 987 (1983) ("Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues.").  To demonstrate prejudice, Petitioner must show a

---

[9] The page references used in this Report reflect the page numbers as enumerated in the court's electronic docketing system rather than those the parties may have assigned.

reasonable probability that, but for his counsel's unreasonable failure to brief a particular issue, Petitioner would have prevailed on appeal. *See* <u>Robbins</u>, 528 U.S. at 285.

The Eleventh Circuit has issued several decisions interpreting the <u>Strickland</u> standard with regard to claims of ineffective assistance of appellate counsel. Appellate counsel cannot be deemed ineffective for failing to raise issues "reasonably considered to be without merit." <u>United States v. Nyhuis</u>, 211 F.3d 1340, 1344 (11th Cir. 2000) (quoting <u>Alvord v. Wainwright</u>, 725 F.2d 1282, 1291 (11th Cir. 1984)). Moreover, the arguments omitted from the appeal must have been significant enough to have affected the outcome of the appeal. <u>Nyhuis</u>, 211 F.3d at 1344 (citing <u>Miller v. Dugger</u>, 858 F.2d 1536, 1538 (11th Cir. 1988)).

2.      Federal Review of State Court Decision

Petitioner raised this claim in his state habeas petition (Ex. O). The First DCA denied the petition on the merits, without explanation (Ex. P).

With regard to the "contrary to" prong of the AEDPA standard, although the First DCA did not cite <u>Strickland</u>, a state court need not cite to, nor even be aware of Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." <u>Early v. Packer</u>, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002). The AEDPA's "unreasonable application" standard focuses on the state court's ultimate conclusion, not the reasoning that led to it. *See* <u>Gill</u>, *supra* at 1291 (citing <u>Harrington</u>, 131 S. Ct. at 786). Under § 2254(d), a habeas court must determine what arguments or theories supported or could have supported the state court's decision, and then ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court. *See* <u>Harrington</u>, 131 S. Ct. at 786; *see also* <u>Gill</u>, *supra,* at 1292 (the federal district court may rely on grounds other than those articulated by the state court in determining that habeas relief was not warranted, so long as the district court did not err in concluding that the state court's rejection of the petitioner's claims was neither an unreasonable application of a Supreme Court holding nor an unreasonable determination of the facts).

The First DCA's decision could have been based upon the theory that Petitioner's appellate counsel did not perform unreasonably by failing to raise a claim of trial court error with regard to denial of the motion for JOA as to Count 9, because that was a weaker argument than the argument

presented by appellate counsel on direct appeal.  On direct appeal, Petitioner's appellate counsel

argued the trial court abused its discretion by failing to accept defense counsel's peremptory strike

of Juror 8, on the ground that his reason for striking her was not genuine (Ex. F).

In assessing the strength of the JOA issue, the court must consider the standard of review the

First DCA would have applied in reviewing the issue on direct appeal.  Where a conviction is based

wholly upon circumstantial evidence (there was no direct evidence as to Count 9), the First DCA

would have applied the following standard of review:

> In reviewing a motion for judgment of acquittal, a de novo standard of review
> applies.  *See* Pagan v. State, 830 So. 2d 792, 803 (Fla. 2002), *cert. denied*, 539 U.S.
> 919 [123 S. Ct. 2278, 156 L. Ed. 2d 137] (2003).  Generally, an appellate court will
> not reverse a conviction that is supported by competent, substantial evidence.  *See*
> Pagan, 830 So. 2d at 803 (citing Donaldson v. State, 722 So. 2d 177 (Fla. 1998);
> Terry v. State, 668 So. 2d 954, 964 (Fla. 1996)).  There is sufficient evidence to
> sustain a conviction if, after viewing the evidence in the light most favorable to the
> State, a rational trier of fact could find the existence of the elements of the crime
> beyond a reasonable doubt.  *See* Banks v. State, 732 So.2d 1065 (Fla. 1999).  "A
> motion for judgment of acquittal should be granted in a circumstantial evidence case
> if the [S]tate fails to present evidence from which the jury can exclude every
> reasonable hypothesis except that of guilt."  Orme v. State, 677 So. 2d 258, 262 (Fla.
> 1996).
>
> "The question of whether the evidence fails to exclude all reasonable
> hypotheses of innocence is for the jury to determine, and where there is substantial,
> competent evidence to support the jury verdict, we will not reverse."  Darling v.
> State, 808 So. 2d 145, 155 (Fla.), *cert. denied*, 537 U.S. 848 [123 S. Ct. 190, 154 L.
> Ed. 2d 78] (2002) (quoting State v. Law, 559 So. 2d 187, 188 (Fla. 1989)).  In
> meeting its burden, the State is not required to "rebut conclusively, every possible
> variation of events" which could be inferred from the evidence, but must introduce
> competent evidence which is inconsistent with the defendant's theory of events.
> Darling, 808 So. 2d at 156 (quoting Law, 559 So. 2d at 189).  Once the State meets
> this threshold burden, it becomes the jury's duty to determine whether the evidence
> is sufficient to exclude every reasonable hypothesis of innocence beyond a
> reasonable doubt.  *Id.*
> . . . .
> This Court does not have to determine that every reasonable hypothesis of
> innocence was excluded in this case.  The sole determination we must make is
> whether there was competent, substantial evidence for the jury to make such a
> determination.  *See* Darling, 808 So. 2d at 156 (citing Law, 559 So. 2d at 188–89).

Troy v. State, 948 So. 2d 635, 645–46 (Fla. 2006).

At trial, Leanne Waldroup, S.L.J.'s mother, testified that S.L.J. told her that Petitioner had been in the garage smoking marijuana on his pipe, and when S.L.J. walked through the garage, he handed the pipe to her, and she took a hit (Ex. B at 161). Additionally, C.N.O. testified that when she arrived at the house, she saw Petitioner and S.L.J. smoking marijuana in the garage, and Petitioner held out the pipe and offered it to C.N.O. (*id.* at 170). L.M.C. also testified she saw Petitioner, Mr. Cross, S.L.J., and N.L.C. smoking marijuana that night (*id.* at 222). It was not unreasonable for Petitioner's appellate counsel to conclude that this evidence was competent, substantial evidence for the jury to determine that every reasonable hypothesis of innocence was excluded as to Count 9. Therefore, counsel's winnowing out this JOA issue on appeal, in favor of the stronger argument that the trial court erred by refusing to accept defense counsel's peremptory strike of Juror 8, was not deficient performance. Furthermore, in light of the testimony provided by Ms. Waldroup, C.N.O., and L.M.C., Petitioner failed to show a reasonable probability of success on appeal if counsel had presented the JOA issue.

Petitioner failed to demonstrate that the First DCA's denial of this claim was contrary to or an unreasonable application of <u>Strickland</u>. Therefore, he is not entitled to relief on Ground One.

B. <u>Ground Two</u>: "The Petitioner was denied effective assistance of counsel guaranteed by the 6th and 14th Amendment [sic] of the United States Constitution when defense counsel was ineffective for not objecting to and for not requesting a replacement for a sleeping juror, thus denying Petitioner to [sic] a fair trial by six jurors; and a meaningful final argument; denying Petitioner's due process of the law [sic]."

Petitioner asserts that during jury selection, prospective juror Willie Bruner informed the court he was on medication that made him drowsy (doc. 1 at 10). Petitioner asserts the trial court informed Bruner that if he was selected for the jury, he could stand and stretch if he became drowsy (*id.*). Petitioner asserts Bruner was selected as a juror and was observed sleeping on both days of trial during testimony of critical witnesses (*id.*). Petitioner states he told defense counsel each time he noticed Juror Bruner sleeping, and counsel responded by telling Petitioner to "keep an eye on him" (*id.*). Petitioner asserts that during defense counsel's closing argument, the prosecutor noticed that Bruner was sleeping and informed the court and defense counsel during a bench conference (*id.*). The trial court then instructed that Bruner be awakened (*id.* at 11). Petitioner contends

defense counsel was ineffective for failing to request that Bruner be replaced with an alternate juror (*id.*).

Respondent concedes Petitioner exhausted this claim in the state courts (doc. 21 at 57). Respondent contends the First DCA's denial of this claim was not contrary to or an unreasonable application of clearly established federal law (*id.* at 57–72).

1. Clearly Established Federal Law

The <u>Strickland</u> standard, set forth *supra*, governs this claim. "The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one." <u>Jones v. Campbell</u>, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing <u>Chandler v. United States</u>, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)). The focus of inquiry under the performance prong is "reasonableness under prevailing professional norms." <u>Strickland</u>, 466 U.S. at 688–89. "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. If the record is not complete regarding counsel's actions, "then the courts should presume 'that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some lawyer might do." <u>Jones</u>, 436 F.3d at 1293 (citing <u>Chandler</u>, 218 F.3d at 1314–15 n.15). Furthermore, "[e]ven if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." <u>Rogers v. Zant</u>, 13 F.3d 384, 386 (11th Cir. 1994). Counsel's performance is deficient only if it is "outside the wide range of professional competence." <u>Jones</u>, 436 F.3d at 1293 (citing <u>Strickland</u>, 466 U.S. at 690); <u>Lancaster v. Newsome</u>, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation"). "[T]here are no 'absolute rules' dictating what reasonable performance is . . . ." <u>Michael v. Crosby</u>, 430 F.3d 1310, 1320 (11th Cir. 2005) (quoting <u>Chandler</u>, 218 F.3d at 1317). Indeed, "'[a]bsolute rules would interfere with counsel's independence—which is also constitutionally protected—and would restrict the wide latitude counsel have in making tactical decisions.'" *Id.* (quoting <u>Putman v. Head</u>, 268 F.3d 1223, 1244 (11th Cir. 2001)).

As to the prejudice prong of the <u>Strickland</u> standard, Petitioner's burden of demonstrating prejudice is high. *See* <u>Wellington v. Moore</u>, 314 F.3d 1256, 1260 (11th Cir. 2002). The Supreme Court has cautioned that "'[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Id.* (quoting <u>Strickland</u>, 466 U.S. at 693). However, the Court has also clarified that a petitioner need not demonstrate it "more likely than not, or prove by a preponderance of evidence," that counsel's errors affected the outcome. <u>Strickland</u>, 466 U.S. at 693–94. Instead,

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Id.* at 694. Indeed, it would be "contrary to" the law clearly established in <u>Strickland</u> for a state court to reject an ineffectiveness claim for failing to prove prejudice by a preponderance of the evidence. <u>Williams v. Taylor</u>, 529 U.S. at 405–06.

The prejudice assessment does "not depend on the idiosyncrasies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law. <u>Strickland</u>, 466 U.S. at 694–95. "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. Further, when the claimed error of counsel occurred at the guilt stage of trial (instead of on appeal), <u>Strickland</u> prejudice is gauged against the outcome of the trial, not on appeal. *See* <u>Purvis v. Crosby</u>, 451 F.3d 734, 739 (11th Cir. 2006) (citing <u>Strickland</u>, 466 U.S. at 694–95).

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact. <u>Strickland</u>, 466 U.S. at 698; <u>Collier v. Turpin</u>, 177 F.3d 1184, 1197 (11th Cir. 1999).

### 2. Federal Review of State Court Decision

Petitioner raised this claim as Grounds One and Two in his amended Rule 3.850 motion (Ex. U at 96–97). The state circuit court adjudicated the claims as follows:

***Sleeping Juror***[FN 9: Defendant's grounds one and two.]

Defendant contends that trial counsel, Steven Sutherland, was ineffective for failing to object to or preserve for appellate review the issue of a sleeping juror. Specifically, Defendant contends that Juror Willie Brunner [sic] was sleeping during parts of the trial. Defendant contends that counsel should have objected to the juror's conduct, questioned the juror about what he had heard, asked that the alternate juror replace the sleeper, or moved for a mistrial. Defendant further alleges that because the sleeping juror actually deliberated, Defendant was "effectively denied [] a jury of six."

### *Juror Replacement or Mistrial*

In order to be granted relief on the matter of a sleeping juror, Defendant must show that the juror was sleeping, counsel knew about the problem, counsel failed to act on the problem, and Defendant was prejudiced by the inaction of counsel. Prejudice may be established by showing that the juror slept through pertinent testimony rather than a less critical portion of the trial such as closing arguments. See Isnignares v. State, 957 So. 2d 680, 682 (Fla. 3d DCA 2007); Wilson v. State, 828 So. 2d 1086, 1086 (Fla. 1st DCA 2002); Bullis v. State, 734 So. 2d 463, 464 (Fla. 5th DCA 1999); and Bieser v. State, 677 So. 2d 59, 59 (Fla. 1st DCA 1996).

The Court convened a limited evidentiary hearing to gather further evidence regarding this claim. At the evidentiary hearing, Attorney Sutherland testified that immediately after the prosecutor had requested the bench conference during closing argument and pointed out the sleeping juror, trial counsel took steps to rectify the situation by attempting to liven up his presentation. Counsel stated that he had not considered moving for a mistrial because the issue was a minor one which could be resolved by vocal inflection and excitement on his part. Further, counsel testified that, by the second day of trial, he felt that the trial had been going very well. The defense had won judgments of acquittal on three counts and all that remained was the presentation of the defense's case.[10] A mistrial, if granted, would have wiped the slate clean, jeopardizing the victories the defendant had obtained. The Court finds that counsel's choice to proceed without moving for a mistrial was a reasonable strategy and not deficient. See Cox v. State, 966 So. 2d 337, 346 (Fla. 2007).

Furthermore, Defendant has failed to prove prejudice. After the presentation of the facts at the evidentiary hearing, the Court finds that even had counsel objected, the juror would not have been excused or a mistrial granted. See Bullis, 734 So. 2d at 464 (stating that "the decision of whether to replace or retain a sleeping juror rests in the sound discretion of the trial court"). There is no persuasive testimony

---

[10] The undersigned Magistrate Judge notes that Mr. Sutherland's testimony that the trial had been going very well, and the defense had won judgments of acquittal on three counts, was provided in response to questioning regarding a different issue litigated at the evidentiary hearing (see Ex. EE at 172–77).

indicating that the juror in question slept through any testimony, only that he nodded off during part of trial counsel's closing argument.

Defendant testified that the juror had slept through the testimony of several witnesses and that Defendant had informed his counsel of this fact. Defendant additionally alleged that he had asked his attorney to move for a colloquy of the juror, for the juror to be excused, or for a mistrial, but that counsel had refused, informing Defendant that he could not afford to hire an attorney for a retrial of the case. The Court does not find Defendant's testimony to be credible. See Booker v. State, 969 So. 2d 186, 194 (Fla. 2007) (noting that weighing the credibility of witnesses at an evidentiary hearing on a postconviction motion is the province of the trial court).

Rather, the Court finds trial counsel's testimony to be credible. Trial counsel testified at the evidentiary hearing that although he had watched the jury closely, he had never noticed a sleeping juror and that Defendant had never brought a sleeping juror to his attention during trial. Also, Attorney Sutherland testified that even after he had informed Defendant of the prosecutor's observation, Defendant had not requested a colloquy with the juror, an objection, or a mistrial. Counsel further testified that he had never told Defendant that he could not afford the expense of another trial because any such statement would have been incorrect. Had a mistrial been declared and Defendant had been unable to retain an attorney privately for another trial, Defendant could have been appointed an attorney at public expense. Consequently, Defendant has proven neither prong of the Strickland analysis, and this claim does not entitle him to relief.

### *Counsel's Comment*

Defendant also contends that when the sleeping juror was brought to counsel's attention, counsel's ensuing comment was unprofessional. The trial transcript reflects this conversation at the bench:

> PROSECUTOR: Your Honor, I would ask that you might look at the black male in the back row. He's been sleeping and nodding off, and—
>
> MR. SUTHERLAND: I don't believe—I'll try to make it more exciting.

Defendant argues that trial counsel's statement showed that he was unconcerned about the sleeping juror and had no intention of alleviating the situation. However, at the evidentiary hearing, counsel stated that, after having been informed at the

> sidebar of the sleeping juror, he decided that he would "make it more exciting, step it up, change the inflection in my voice, or whatever, because I was of the opinion perhaps my final argument was kind of boring." The Court finds that trial counsel's statement, read in the light of his testimony at the evidentiary hearing, shows not antipathy but resolve to remedy the problem. This allegation does not entitle Defendant to relief.

(Ex. GG at 249–52) (citations to trial and evidentiary hearing transcripts omitted). Petitioner argued this issue on appeal to the First DCA, and the appellate court affirmed the lower court's decision without written opinion (Exs. JJ, LL).

The record reflects that during jury selection, the court asked the jurors if any of them were taking medication that would cause difficulty with drowsiness or with being attentive (Ex. B at 13). Prospective juror Bruner answered, "Yes, sir." (*id.*). The court told Mr. Bruner, "Mr. Bruner, can standing as you need to—not right now, sir, but if you happen to get drowsy or have any difficulty, would standing be adequate for you, being able to get up and move about a little bit, where you could keep alert and attentive? Please do so. So you're the one that will feel when you're starting to get a little drowsy, just stand up if you need to do it, to remain alert and attentive. All right, sir?" (*id.*). Mr. Bruner responded, "Yes, sir." (*id.*). Jury selection continued, and Mr. Bruner was selected as a juror (*id.* at 85).

During defense counsel's closing argument, the prosecutor asked to approach the bench about a juror he had observed nodding off:

> MR. BERRIGAN [the prosecutor]: Your Honor, may I interject something? Can we approach the bench, please?
>
> THE COURT: Certainly.
>
> (Discussion held at the bench:
>
> MR. BERRIGAN: Your Honor, I would ask that you might look at the black male in the back row. He's been sleeping and nodding off, and—
>
> MR. SUTHERLAND [defense counsel]: I don't believe—I'll try to make it more exciting.
>
> (Bench conference concluded.)

(Ex. B at 540–41). Closing arguments continued with no further reference to Juror Bruner.

At the postconviction evidentiary hearing on this claim, the same judge presided who had presided at Petitioner's trial. Petitioner's trial counsel, Mr. Sutherland, testified as follows:

Q [by Petitioner's postconviction counsel]. Okay. There is [sic] basically two different grounds here. One is the sleeping juror and one is the lesser included. We'll, talk about them—I'll go through them one at a time. Do you recall the issue of the sleeping juror?

A [by Petitioner's trial counsel]. I did. I had an opportunity to review the portion of the transcript that involved that and I remembered it.

Q. And what do you recall?

A. Well, during final arguments, addressing the jury or whatever, Mr. Berrigan, who was the Assistant State Attorney representing the State of Florida at that time, asked for a conference with the Court, or whatever, and so, we went up there and he indicated that one of the jurors in the back row was nodding off and we looked over there and it appeared that this gentleman was nodding.

Q. So, the prosecutor noticed the person before you did?

A. Yes. I never noticed it.

Q. Okay. Now, after that—after the sidebar you came back to the table, what, if any, discussion with your client did you have about that issue?

A. Well, the sidebar with the Court, we saw it there and I just indicated to the Court that I hadn't noticed it, but that I would step up my argument. In other words, we would make it more exciting, step it up, change the inflection in my voice, or whatever, because I was of the opinion perhaps my final argument was kind of boring and that thing there [sic]. So it was my intention that if he, in fact, was tending to go to sleep and not pay attention to me, that my argument should have—change with the inflection of my voice, or whatever, so he would not go to sleep. I don't remember talking right then with Mr. Cutaio. I know that Mr. Cutaio did ask me what that was about and I told him that we had a situation where it looked like one of the jurors was getting sleepy and had been nodding throughout the—at that portion of the final argument.

Q. Was that the extent of your conversation with Mr. Cutaio about it?

A. Yes. As far as I recollect.

Q.  Did you—do you remember—if you remember, do you remember Mr. Cutaio telling you that he had also noticed the person nodding off?

A.  No, I don't.

Q.  Do you recall him asking you to request questioning of the juror?

A.  No.

Q.  Did y'all discuss a mistrial at any point?

A.  No.  At that stage of the game, I wasn't even thinking of mistrial.  Like I said, we just had a juror that was kind of nodding and that I just needed to put some emphasis, maybe raise my voice a little bit to keep that from happening.  I haven't even thought about mistrial, so I certainly didn't talk to Mr. Cutaio about a mistrial.

Q.  And do you recall him asking you about one?

A.  No.

Q.  Do you remember a discussion with Mr. Cutaio that he wouldn't be able to afford another trial if there was a retrial?

A.  No, I didn't have that discussion with him.  That wouldn't be a true statement.

Q.  Can you elaborate on that?

A.  Certainly.  Mr. Cutaio—if the case either hung up or had a mistrial, or whatever, certainly would be afforded an attorney whether it would be a privately retained attorney, if he could hire one, or it would be a public defender.  So he would not be without means to have another attorney represent him in case this went to another trial, and I was well aware of that, so I never would have had a discussion with him saying he couldn't afford another trial.

Q.  If there had—if, for whatever reason, that trial [] would have been mistried or anything like that, did you intend to represent him again on the second trial?

A.  If he wanted me to.

Q.  If he paid you to?

A.  Oh, yeah.  He would have been required to pay, that's true.

Q.  All right.  After everyone noticed the juror was nodding off or sleeping, did you request—

A.  Well, I don't know about everybody noticed it.  I know that the State attorney noticed it.

Q.  Well, after the prosecutor, yourself and the Judge noticed and had that discussion—

A.  Well, after it was brought to the Court's attention, that's correct.

Q.  Okay.  At any time after that, did you ask the Court to dismiss that juror and seat the alternate?

A.  No.

Q.  You said that that's the first time you noticed him sleeping, is it possible he had been sleeping through other parts and you hadn't notice?

A.   I do watch the jury pretty closely, especially when the State is cross-examining and doing their thing there.  And I was in front of the jury giving my final argument and watching them because you always watch facial inflections to see how well things are going over, and I did not notice any of the jurors nodding or sleeping, but apparently this one juror that the State attorney did notice, and when we came up to the bench, I believe we looked over there and it looked like he might have been nodding.

Q.  So just—

A.  I hadn't noticed before and I hadn't noticed during the trial.

Q.  That's what I was going to say, a few moments before that you hadn't noticed?

A.  That's correct.

Q.  Even though you were standing in front, addressing the jury?

A.  That's correct.

Q.  Did you ever file a motion for a new trial based on this fact?

A. On that fact, no.

Q. Right.

A. No.

Q. And just in summary about the sleeping juror, did you make any type of motions or objections or anything that would preserve it for any type of further review?

A. No.

(Ex. EE at 152–58).

On cross-examination, Mr. Sutherland testified as follows:

Q [by the State].  Okay.  Let's talk about the sleeping juror for a minute.  I want to go back to jury selection with you, okay.  Have you had a chance to review the transcript of jury selection?

A. No, but—

Q. Okay.  During the course of jury selection—I forget it's cross and I can lead, sorry—the Judge inquired of the venire whether anyone was on any medications or would have any—any medications that may cause them to be drowsy, correct?

A. I don't know if the Judge inquired.  I know that the attorneys would have inquired.  That's one of my particular jury instructions, if there's any reason, medication, illness, uncomfortable, whatever, as to why you could not sit on a jury.

Q. Okay.  And actually one juror did say, yes, I'm on something that may cause me to be drowsy, do you remember that?

A. I don't remember that.

Q. Okay.  Let me do this, would it help to refresh your memory if you could review just that page of jury selection?

A. It might.

MS. KINSEY [counsel for the State]:  Okay. Then I'm going to refer Counsel to—let me get that page, Volume I of the transcript, page 13, lines 6 through 20.  May I approach?

THE COURT:  Yes, ma'am.

THE WITNESS [Mr. Sutherland]:  Okay.

Q (By Ms. Kinsey)  Does it help refresh your memory a little bit about that day?

A.  A little bit.

Q.  Okay.  Eventually that juror was selected for this jury, correct?

A.  That is correct.

Q.  Was that the same juror who was nodding off?

A.  I don't know.

Q.  Was it ever pointed out that that was the same juror?

A.  No.

Q.  Okay.  Now, Mr. Cutaio was pretty active during jury selection; is that correct?

A.  Mr. Cutaio assisted his attorney quite well, yes.

Q.  Okay.  And felt comfortable asking the Judge questions during jury selection when he had questions?

A.  I think that he did.  I think if he had any questions that I couldn't fully explain to him, he asked the Court about them.

Q.  And then the Court answered any questions he had during jury selection?

A.  The best I know, the Judge did, yes.

Q.  Okay. So, would it be fair to say that Mr. Cutaio was not afraid to voice his opinion in his own case?

A.  That's probably a fair statement.

Q.  And that he felt comfortable saying stop, wait, I have a question?

A.  Yes.

Q.  Now, specifically—no, wait.  Let me finish this.  I am sorry.  Did Mr. Cutaio ever ask you to do an appeal on the basis of the sleeping juror?

A.  No.

Q.  Did he never ask you to file a motion for a new trial based on this sleeping juror?

A.  No.

Q.  In fact, was that conversation even extensive with him about the sleeping juror?

A.  No.

Q.  Did he ever say, wait, stop, stop the trial?

A.  No.

Q.  Did he ever say, I want you to ask the juror if he was paying attention?

A.  No.

Q.  Did he ever ask you to do anything with regard to that sleeping juror?

A.  No.

Q.  Now, over the course— did you say you've been practicing since '73?

A.  Yes.

Q.  So that's—I'm not going to do that math.  How often have you seen a juror nod off or fall asleep during a trial?

A.  Oh, many, many times.  I don't know about falling asleep, but they nod off, and then the attorneys have ways of waking them up.  Sometimes if we don't get,

you know, admonishment from the judge for theatrics, you know, sometimes you can drop a book or something like that.

      Q.  Would it be fair to say that it happens pretty regularly?

      A.  Yes.

      Q.  Okay.  Did you ever threaten Mr. Cutaio with regard to that juror, the sleeping juror, in any way?

      A.  I never threatened Mr. Cutaio with anything.

      Q.  All right.  Let's move on.  Had Mr. Cutaio asked you to do something about the sleeping juror, would you have considered it?

      A.  I always would consider it.  I would have talked him about it, or whatever, but like I indicated earlier, when we talked with the Judge, or whatever, mistrial was the furthest from my mind.  That's just a wake up call to me that I needed to step up my arguments, or whatever, it was boring.  Like I said, I hadn't noticed anybody sleeping during the trial or even during the thing there, the arguments.

      Q.  When you looked over at this juror, was he sleeping or was he nodding or could you ever tell?

      A.  My thing was that the juror didn't know we were up here, we looked over at him, and he was kind of nodding.

      Q.  Okay.  You're doing a head bob with your head.  So that the record is clear, okay.

      A. Yes.

(Ex. EE at 168–73).

Petitioner testified at the evidentiary hearing that the first time he noticed this juror sleeping was on the first day of trial during the testimony of the either the DNA expert or the nurse (Ex. EE at 192).  Petitioner testified that when he saw the juror sleeping during the testimony of the DNA expert, he informed defense counsel, and defense counsel told him not to say anything about it, because it would result in a mistrial (*id.* at 194).  Petitioner testified the juror was also sleeping during the testimony of S.L.J., particularly her testimony that when she first arrived at the house

Petitioner had been staggering and slurring his speech (*id.* at 194–95). Petitioner testified that every time he saw the juror sleeping, he notified counsel, and counsel told him he could not afford the cost of a new trial (*id.* at 196–97). Petitioner testified he wanted counsel to request a mistrial when the prosecutor noticed the juror sleeping during defense counsel's closing argument (*id.* at 197). He testified he asked counsel if he could request the court to interview the juror, but counsel responded no, that it would only result in a mistrial (*id.* at 198).

In the state postconviction court's order, the court expressly cited the two-pronged <u>Strickland</u> standard as the legal standard applicable to this claim (*see* Ex. GG at 247–48). Therefore, Petitioner is entitled to relief only if he demonstrates the state court's adjudication was unreasonable, either because it was based upon an unreasonable determination of the facts or unreasonably applied <u>Strickland</u>.

Petitioner contends the state court's decision was based upon an unreasonable determination of fact, specifically, the finding that defense counsel's testimony was more credible than his (*see* doc. 1 at 11). "Determining the credibility of witnesses is the province and function of the state courts, not a federal court engaging in habeas review." <u>Consalvo v. Sec'y for Dep't of Corr.</u>, 664 F.3d 842, 845 (11th Cir. 2011); *see also* <u>Gore v. Sec'y for Dep't of Corr.</u>, 492 F.3d 1273, 1300 (11th Cir. 2007) (noting that while reviewing court also gives a certain amount of deference to credibility determinations, that deference is heightened on habeas review) (citing <u>Rice v. Collins</u>, 546 U.S. 333, 341–42, 126 S. Ct. 969, 163 L. Ed. 2d 824 (2006) (stating that "[r]easonable minds reviewing the record might disagree about the [witness'] credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination")). Federal habeas courts have "no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them." <u>Marshall v. Lonberger</u>, 459 U.S. 422, 434, 103 S. Ct. 843, 74 L. Ed. 2d 646 (1983); *see also* <u>Baldwin v. Johnson</u>, 152 F.3d 1304, 1317 (11th Cir. 1998); <u>Smith v. Kemp</u>, 715 F.2d 1459, 1465 (11th Cir. 1983) ("Resolution of conflicts in evidence and credibility issues rests within the province of the state habeas court, provided petitioner has been afforded the opportunity to a full and fair hearing."). Questions of the credibility and demeanor of a witness are questions of fact. *See* <u>Consalvo</u>, *supra* (citing <u>Freund v. Butterworth</u>, 165 F.3d 839, 862 (11th Cir. 1999) (en banc)). The AEDPA affords a presumption of correctness to a factual determination made by a state court; the

habeas petitioner has the burden of overcoming the presumption of correctness by clear and convincing evidence. *See* 28 U.S.C. § 2254(e).

Here, the postconviction court heard live testimony and made a credibility determination. Petitioner's argument is insufficient to overcome the presumption of correctness by clear and convincing evidence, 28 U.S.C. § 2254(e)(1). In light of the state court's findings that (1) there was no persuasive testimony indicating that the juror in question slept through any testimony, only that he nodded off during part of defense counsel's closing argument, (2) defense counsel watched the jury closely during trial and never noticed a sleeping juror, (3) Petitioner never brought a sleeping juror to his attention during trial, (4) immediately after the juror nodded off during closing argument, defense counsel took steps to rectify the situation by attempting to "liven up" his argument, (5) after defense counsel informed Petitioner of the prosecutor's observation of the "nodding off" juror, Petitioner did not request a colloquy with the juror, an objection, or a mistrial, (6) defense counsel never told Petitioner he could not afford the expense of another trial, and (7) had a mistrial been declared and Petitioner had been unable to retain a private attorney for another trial, Petitioner could have been appointed an attorney at public expense, it was not objectively unreasonable to conclude that Petitioner failed to establish deficient performance or prejudice under Strickland.

The state court's adjudication of this claim was not based upon an unreasonable determination of the facts, nor was it contrary to or an unreasonable application of Strickland. Therefore, Petitioner is not entitled to federal habeas relief on Ground Two. *See, e.g.,* Williams v. McNeil, No. 4:08cv192/SPM/MD, 2010 WL 144986, at *11 (N.D. Fla. Jan. 7, 2010) (in light of state court's factual finding that juror was not asleep during trial, state court's denial of ineffective assistance of counsel claim, based upon counsel's failure to act, was not objectively unreasonable).

C.    Ground Three: "The lower court erred in summarily denying Grounds 4, 5, 6, 7, and 8 in the Petitioner's motion for post-conviction relief, when the Petitioner was entitled to an evidentiary hearing because the motion was legally sufficient and the allegations were not conclusively refuted by the record."

Petitioner asserts the postconviction court summarily denied Grounds Four, Five, Six, Seven, and Eight of his amended Rule 3.850 motion, without holding a hearing on those claims or attaching portions of the record conclusively refuting them (doc. 1 at 12–13). He asserts at the evidentiary hearing, his postconviction counsel advised the court that his understanding was that the only

grounds that were the subject of the hearing were Grounds One, Two, Three, and Nine (*id.*). Petitioner asserts the court never issued an order directing the State to file a response to Grounds Four through Eight, which he asserted in his first supplement to his Rule 3.850 motion (*id.*). He contends he was entitled to an evidentiary hearing on those claims (*id.*).

Respondent contends Petitioner's claim that the postconviction court should have conducted an evidentiary hearing on Grounds Four through Eight of his amended Rule 3.850 motion does not constitute a federal claim giving rise to habeas relief (doc. 21 at 74). Respondent asserts Petitioner does not challenge the state court's substantive denial of his claims, rather, Petitioner complains only of a procedural defect in the state collateral proceeding, which does not, of itself, provide a basis for federal habeas relief (*id.*).[11]

In Petitioner's reply, he reasserts his arguments that the postconviction court erred by failing to issue an order directing the State to respond to Grounds Four through Eight, and failing to attach any portions of the record to its order denying his amended Rule 3.850 motion (doc. 26 at 9).

The Eleventh Circuit has repeatedly held that defects in state collateral proceedings do not provide a basis for habeas relief. *See* Carroll v. Sec'y, DOC, 574 F.3d 1354, 1365 (11th Cir. 2009); Anderson v. Sec'y for Dep't of Corr., 462 F.3d 1319, 1330 (11th Cir. 2006) (per curiam); Quince v. Crosby, 360 F.3d 1259, 1262 (11th Cir. 2004); Spradley v. Dugger, 825 F.2d 1566, 1568 (11th Cir. 1987) (per curiam). The reasoning behind this well-established principle is straightforward: a challenge to a state collateral proceeding does not undermine the legality of the detention or imprisonment—that is, the conviction itself—and thus habeas relief is not an appropriate remedy. *See* Carroll, 574 at 1365; Quince, 360 F.3d at 1261–62; Spradley, 825 F.2d at 1568. Furthermore, such challenges often involve claims under state law, for example, Florida Rule of Criminal Procedure 3.850, which governs the availability of, and procedures attendant to, post-conviction proceedings in Florida; and a state's interpretation of its own laws or rules provides no basis for federal habeas corpus relief, since no question of a constitutional nature is involved. *See* Carroll, 574 F.3d at 1365 (quoting McCullough v. Singletary, 967 F.2d 530, 535 (11th Cir. 1992)).

---

[11] Petitioner challenges the state court's substantive denial of these claims in Grounds Four, Five, and Six, discussed *infra*.

The errors of which Petitioner complains occurred during the state postconviction proceeding, not his criminal trial. Those alleged errors do not undermine the legality of his imprisonment. Therefore, Petitioner is not entitled to federal habeas relief on Ground Three.

D.      Ground Four: "The Petitioner was denied effective assistance of counsel which is guaranteed by the 6th and 14th Amendment [sic] of the United States Constitution when defense counsel failed to read all of the juror questionnaire cards during voir dire, denying Petitioner a meaningful voir dire thus producing a biased juror."

Petitioner asserts that during voir dire, defense counsel informed the court that he had not read all of the jury questionnaire cards (doc. 1 at 13). Petitioner asserts Juror Anthony Manning had checked "Yes" on his questionnaire indicating he had a close friend or family in law enforcement, but Manning failed to raise his hand in response to defense counsel's question regarding law enforcement experience and relatives in law enforcement (*id.* at 13–14). Petitioner asserts Juror Manning is a Wildlife Officer and has family in law enforcement (*id.* at 14). He asserts prospective juror Hargrove was stricken for her failure to respond to the same oral question posed by defense counsel, where she had marked "yes" on her questionnaire regarding having a close friend or family in law enforcement, and defense counsel had read her card (*id.*). Petitioner asserts counsel failed to meet the five requirements for voir dire: (1) engage in substantial questioning of potential jurors; (2) utilize the juror questionnaire card throughout voir dire; (3) question jurors about contradictory answers in their questionnaires; (4) use all of their peremptory challenges; and (5) consult with the defendant to get his input (*id.*). He contends if had defense counsel had read all of the jury cards, he would have noticed the contradictory information, and Mr. Manning would have been stricken (*id.*). Petitioner contends he was prejudiced by counsel's error, because a juror who would have been stricken was actually seated and deliberated, and the government never proved that this juror could render a fair and impartial verdict (*id.* at 15).

Respondent concedes Petitioner exhausted this claim (doc. 21 at 76). Respondent contends the state court's adjudication of the claim was not contrary to or an unreasonable application of clearly established federal law (*id.* at 76–78).

1.      Clearly Established Federal Law

The Strickland standard, set forth *supra*, governs this claim.

2.      Federal Review of State Court Decision

Petitioner raised this claim as Grounds Four through Six in his first supplement to his Rule 3.850 motion (Ex. X at 104–11). He alleged Mr. Manning indicated on his juror questionnaire he was presently employed as a maintenance mechanic for the Escambia County Parks and Recreation Department (*id.* at 104). Petitioner alleged he discovered after trial that Juror Manning was in training to become a forestry ranger at the time of voir dire, and Manning became employed with "the Forestry Division in Molino" at the time Petitioner filed his supplement to his amended Rule 3.850 motion (*id.* at 104). Petitioner also asserted Manning "has a family member who works for the Escambia County Sheriff's Department" (*id.*). Petitioner submitted a copy of Juror Manning's juror questionnaire, in which Manning stated he was presently employed as a maintenance mechanic for the Escambia County Parks and Recreation Department, and he indicated "yes" in answer to the question asking if he was a close friend or relative of any law enforcement officer (*id.* at 119).

The state circuit court adjudicated the claims as follows:

***Untruthful Biased Juror***[FN 25: Defendant's grounds four, five, and six.]

Defendant next alleges that trial counsel was ineffective for failing to read the juror questionnaire cards before voir dire, thereby failing to strike a biased and untruthful juror. Specifically, Defendant claims that when counsel asked the venire whether any of them had a family member or close friend in law enforcement, one veniremen did not raise his hand, though he had indicated on his juror questionnaire that he did have law enforcement ties. The veniremen was selected for and deliberated on Defendant's jury. Defendant contends that the juror was biased and untruthful and should have been struck from the venire.

"'[W]here a postconviction motion alleges that trial counsel was ineffective for failing to raise or preserve a cause challenge, the defendant must demonstrate that a juror was actually biased' to be entitled to relief. . . . [A]ctual bias means . . . [that] the defendant must demonstrate that the juror in question was not impartial—i.e. that the juror was biased against the defendant, and the evidence of bias must be plain on the face of the record." Owen v. State, 986 So. 2d 534, 549 (Fla. 2008) (internal citations omitted).

In this case, Defendant has failed to allege any facts that would demonstrate that the juror in question was actually biased against the Defendant. The mere fact that the juror had a family member or friend in law enforcement does not prove that the juror had any actual bias against Defendant. A review of the record reveals no facts that would lead the Court to believe that the juror failed to be impartial in

Defendant's case.  Defendant's grounds four, five, and six cannot entitle him to relief.

(Ex. GG at 253–54).  Petitioner argued this issue on appeal to the First DCA, and the appellate court affirmed the lower court's decision without written opinion (Exs. JJ, LL).

Petitioner contends the state court unreasonably determined he failed to demonstrate prejudice resulting from counsel's failure to review Juror Manning's questionnaire (*see* doc. 1 at 15; doc. 26 at 11).  He contends the fact that Manning served on the jury when he should have and would have been stricken establishes prejudice (doc. 26 at 11).

It is axiomatic that an accused is guaranteed the right to a fair trial by a panel of impartial and indifferent jurors.  *See* Irvin v. Dowd, 366 U.S. 717, 722, (1961).  However, even in a case where a juror is not struck for cause, but arguably should have been, a petitioner is not entitled to relief unless the disqualifying fact was so prejudicial that the refusal deprived the petitioner of a fundamentally fair trial.  *See* Passman v. Blackburn, 652 F.2d 559, 567 (5th Cir. 1981).  In Florida, the test for whether a juror is competent is "whether the juror can lay aside any bias or prejudice and render his verdict solely upon the evidence presented and the instruction on the law given to him by the court."[12]  Turner v. State, 645 So.2d 444, 446 (Fla.1994).

Initially, Petitioner's assertion that prospective juror Hargrove was stricken for her failure to respond to defense counsel's oral question regarding relatives in law enforcement, after she had marked "yes" on her questionnaire regarding having a relation with law enforcement, is a mischaracterization of the record.  Defense counsel struck Ms. Hargrove because she indicated in her questionnaire that she had a relation with law enforcement and she was a secretary at a school (*see* Ex. B at 76–77).  Additionally, assuming the truth of Petitioner's factual assertions that Juror Manning was in training to be a forestry ranger at the time of voir dire and had a family member employed by the Escambia County Sheriff's Department, these facts, alone, do not suggest that allowing Mr. Manning to serve on the jury impinged upon the fundamental fairness of Petitioner's trial.  There is no indication in the record that Mr. Manning was not fair and impartial, did not follow

---

[12] Similarly, in federal court, a juror may be dismissed when just cause exists (that is, when that juror refuses to apply the law or to follow the court's instructions).  *See generally* United States v. Abbell, 271 F.3d 1286, 1302 (11th Cir. 2001).

the law as instructed by the court, assessed the testimony of the law enforcement witnesses more favorably than other witnesses, or had a fixed belief in Petitioner's guilt. During questioning by counsel for both sides, counsel explained the presumption of innocence and that it was the State's burden to prove Petitioner's guilt, and when the prosecutor asked if anyone had a problem with that concept, Mr. Manning remained silent (Ex. B at 38, 65–66). Counsel explained the concept of reasonable doubt and asked whether everyone understood that, and Mr. Manning again remained silent (*id.*). Mr. Manning's remaining silent indicates he understood and agreed with the concepts of reasonable doubt, the presumption of innocence, and the State's burden to prove guilt. The prosecutor also asked if there was any reason, other than those he discussed (which did not include associations with law enforcement), anyone felt he or she would not be an appropriate juror (*id.* at 53). Mr. Manning once again remained silent (*id.*). Mr. Manning also remained silent when defense counsel asked, ". . . is there anybody in your immediate family, your spouse, your child, a close nephew that is presently in law enforcement or has law enforcement experience . . . ?" (*id.* at 55–59). However, his silence does not suggest he was attempting to hide any association with law enforcement, since he disclosed on his questionnaire that he was a close friend or relative of a law enforcement officer. At most, Manning avoided being questioned as to whether that fact would cause him to believe that a law enforcement officer would be more credible than any other witness (*see id.* at 55–60), but the absence of an answer to that question, without more, is insufficient to show Manning was biased, partial, or unable to render a fair verdict.

Petitioner failed to demonstrate that the state court's adjudication of this claim was an unreasonable application of <u>Strickland</u>. Therefore, he is not entitled to habeas relief on Ground Four.

>    E.    <u>Ground Five: "The Petitioner was denied effective assistance of counsel which is guaranteed by the 6th and 14th Amendment [sic] of the United States Constitution when Petitioner's counsel was ineffective for failure to introduce photographs."</u>

Petitioner contends defense counsel was ineffective for failing to introduce into evidence photographs depicting his co-defendant, Mr. Cross, drinking with the victims, having sex with one of the victims, and having sexual contact with another victim (doc. 1 at 15; doc. 26 at 13). He alleges another photograph depicts one of the victims rolling a marijuana cigarette (*see id.*).

Petitioner argues the photographs would have impeached Mr. Cross's testimony that he did nothing wrong that night (doc. 1 at 16). He additionally asserts the photographs would have impeached some of the victims' testimony that they were extremely "out of it" and "beaten and battered," because the girls appear fine in the photographs (doc. 1 at 16; doc. 26 at 13–14).

Respondent concedes Petitioner exhausted this claim (doc. 21 at 79). Respondent contends the state court's adjudication of the claim was not contrary to or an unreasonable application of Strickland (*id.* at 80–81).

1.      Clearly Established Federal Law

The Strickland standard, set forth *supra*, governs this claim.

2.      Federal Review of State Court Decision

Petitioner raised this claim as Ground Seven in his first supplement to his amended Rule 3.850 motion (Ex. X at 112–14). The state circuit court adjudicated the claim as follows:

***Photographic Evidence***[FN 26: Defendant's ground seven.]

> In his next allegation, Defendant contends that trial counsel was ineffective for failing to "object to the State['s] not introducing the photos" of the night in question. Defendant alleges that showing the photographs to the jury would have weakened the State's case against Defendant because the photographs would have portrayed the codefendant as having been in control of the evening. Additionally, Defendant's absence from the photographs would have corroborated the testimony that Defendant had passed out from involuntary intoxication.

> Counsel was not deficient for failing to object when the State rested its case without having admitted the photographs in question into evidence. In a criminal trial, the State has the responsibility for presenting that evidence which it deems admissible and relevant to the proof of its case. Trial counsel may choose to present any relevant, admissible evidence tending to negate the State's proof or to demonstrate Defendant's lack of guilt. However, trial counsel may not be considered deficient for failing to object to the State's decision not to introduce specific evidence. Therefore, Defendant's claim does not demonstrate deficient performance of counsel or prejudice and cannot entitled him to relief.

> Even had Defendant alleged that his counsel should have introduced the photographs in question into evidence, Defendant would still be entitled to no relief. Contrary to his assertion, the fact that Defendant did not appear in the photographs does not necessarily prove that he was uninvolved in the offenses, and it does not demonstrate that Defendant was unconscious during the offenses. Furthermore,

> Defendant has failed to demonstrate how photographs of particular moments could have depicted his co-defendant as being "in control" of the entire event. Additionally, it is likely that the offensive nature of the photographs would have been prejudicial to Defendant. Consequently, this claim cannot entitle Defendant to relief.

(Ex. GG at 254–55). Petitioner argued this issue on appeal to the First DCA, and the appellate court affirmed the lower court's decision without written opinion (Exs. JJ, LL).

Even without introduction of the photographs, the jury was aware that Mr. Cross did something wrong that night. Cross admitted he was intoxicated when he drove the girls in his truck when they went "mud riding" (Ex. B at 373). He also admitted the evidence "is certainly there to suggest" he had sex with at least one of the girls (*id.* at 375). The jury also heard N.L.C.'s testimony that she observed Mr. Cross's hands under one of the girls' shirts.

Further, the photographs had little, if any, impeachment value with regard to the victims' testimony. Petitioner argues the photographs would have impeached some of the victims' testimony that they were so "out of it" that they were helpless, because they appear fine in the photographs. However, the girls (namely, C.N.O. and L.M.C.) testified they were extremely intoxicated <u>during</u> the mud rides when the sexual offenses occurred, and Petitioner concedes the photographs were taken <u>after</u> the sexual offenses occurred (*see* doc. 1 at 16). Furthermore, L.M.C. testified she slept after the offenses occurred and before the girls took pictures. Petitioner failed to show a reasonable probability the result of his trial would have been different if the jury had seen the photographs he describes. Therefore, the state court's adjudication of this claim was not unreasonable.

    F.    <u>Ground Six: "The Petitioner was denied effective assistance of counsel which is guaranteed by the 6th and 14th Amendment [sic] of the United States Constitution when Petitioner's counsel was ineffective for not calling a sworn witness."</u>

Petitioner contends defense counsel was ineffective for failing to call Richard Bolser to testify on behalf of the defense (doc. 1 at 16–18). Petitioner contends Mr. Bolser's testimony would have cast doubt on Petitioner's guilt and supported his only defense of involuntary intoxication (*id.* at 16–17). Petitioner asserts he spoke to Mr. Bolser multiple times during the day in question while he was fishing with co-defendant Cross and defense witness Michael Kerr (*id.* at 17). Petitioner alleges one of those conversations occurred just one hour prior to the end of the fishing trip, and Bolser would have testified that Petitioner's speech and "state of mind" were normal and "not

intoxicated" (doc. 1 at 17; doc. 26 at 15). Petitioner alleges Bolser would have further testified that he called Petitioner's house one hour later, and heard Petitioner's daughter attempt to waken Petitioner, and when Petitioner came to the phone, he was unable to hold a conversation with Bolser due to his intoxication (*id.*). Petitioner asserts Michael Kerr testified he saw co-defendant Cross placing some type of liquid drug from a brown vial into Petitioner's beer while stating, "Watch I'm gonna get Mike F'd up and he won't remember anything." (doc. 1 at 17). Additionally, Mr. Monn testified he saw Cross with a brown vial at Petitioner's house and making a drink for Petitioner (*id.*). Petitioner states he remembers only having the one beer that co-defendant Cross gave him (*id.*). He states passing out and slurring his speech were not his normal behavior after one beer, and Bolser's testimony would have established this (doc. 1 at 17; doc. 26 at 17). Petitioner contends Mr. Bolser's testimony was thus crucial to the defense of involuntary intoxication (*id.*).

Respondent concedes Petitioner exhausted this claim (doc. 21 at 83). Respondent contends the state court's adjudication of the claim was not contrary to or an unreasonable application of Strickland (*id.* at 85–85).

### 1.    Clearly Established Federal Law

The Strickland standard, set forth *supra*, governs this claim.

### 2.    Federal Review of State Court Decision

Petitioner raised this claim as Ground Eight in his first supplement to his amended Rule 3.850 motion (Ex. X at 114–15). The state circuit court adjudicated the claim as follows:

***Witness Bolser***

Defendant further alleges that his trial counsel was ineffective for failing to call available witness Richard Bolser. Defendant alleges that Mr. Bolser had been sworn in as a witness and was available for both days of the trial. Defendant states that Bolser would have testified that Defendant had been fishing during the day in question, that Bolser was in contact with Defendant the entire day, that Defendant was exceedingly intoxicated, and that, at one point during the evening, Bolser had called to speak to Defendant and Defendant's daughter had had to rouse Defendant from a drunken slumber.

Defendant cannot prove that Bolser's testimony would have changed the jury verdict in this case. Defendant has failed to show the relevance of Defendant's activities before the "slumber party" began; therefore, the omission of Bolser's

testimony that Defendant had been fishing and that the two had been in contact all day long has not been shown to have prejudiced Defendant.  Also, Defendant has failed to prove how he was prejudiced by the omission of Bolser's testimony that Defendant was extremely intoxicated and that Defendant's daughter had had to wake him to speak with Bolser on the telephone.  Even had Bolser testified to Defendant's intoxication and slumber, that testimony would not necessarily have corroborated Defendant's assertion that he was *involuntary* intoxicated nor would it have shown that Defendant slept through the events of the evening after the telephone call. Defendant also does not claim that Bolser could account for Defendant's whereabouts or mental state during the times that the actual offenses were taking place.  Therefore, Defendant has not overcome the Court's requisite strong presumption that counsel was acting according to his reasonable professional judgment when he failed to call Witness Bolser, and this claim does not entitle him to relief.

(Ex. GG at 255–56) (emphasis in original).  Petitioner argued this issue on appeal to the First DCA, and the appellate court affirmed the lower court's decision without written opinion (Exs. JJ, LL).

Counsel's decision whether to call a particular witness is a matter of trial strategy entitled to great deference.  Chandler v. United States, 218 F.3d 1305, at 1314 n.14 (11th Cir. 2000) (citing Waters v. Thomas, 46 F.3d 1506, 1512, 1518–19 (11th Cir. 1995) (en banc)).  If the record is not complete regarding counsel's actions, then the courts should presume "that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some reasonable lawyer might do."  Id. at 1314–15 n.15.  "The mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel."  Waters, 46 F.3d at 1514. "Complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative."  Buckelew v. United States, 575 F.2d 515, 521 (5th Cir. 1978).

Initially, Petitioner did not submit an affidavit from Mr. Bolser stating he was available to testify and setting forth the substance of his proposed testimony; therefore, Petitioner's allegations as to the content of Mr. Bolser's testimony are purely speculative.  Further, assuming arguendo that Mr. Bolser would have testified as Petitioner alleges, the testimony would not have supported Petitioner's defense that he was underlinvoluntarily intoxicated when the offenses occurred, for the reasons

articulated by the state court.[13]  Therefore, Petitioner failed to show that defense counsel's failure

to call Mr. Bolser was unreasonable, and Petitioner also failed to satisfy his burden of showing a

reasonable probability the outcome of his trial would have been different had counsel presented Mr.

Bolser's testimony.  Accordingly, Petitioner is not entitled to habeas relief on Ground Six.

> G.     Ground Seven:  "The Petitioner was denied effective assistance of counsel which is
> guaranteed by the 5th, 6th and 14th Amendment [sic] of the United States Constitution when
> Petitioner's counsel was ineffective for presenting an erroneous and improper jury
> instruction of involuntary intoxication, thus Petitioner was denied due process of law."

Petitioner contends defense counsel was ineffective by drafting and presenting a jury

instruction on involuntary intoxication which did not adequately instruct the jury on the defense and

actually negated Petitioner's defense (doc. 1 at 18–20).  Petitioner asserts he presented this claim

as part of Ground Nine of his amended Rule 3.850 motion, and the issue was litigated at the

evidentiary hearing (doc. 1 at 18–20; doc. 26 at 18–20).  However, according to Petitioner, the state

circuit court did not rule on this aspect of Ground Nine, as evidenced by the court's failure to discuss

it in its written opinion (*id.*).  Petitioner contends the circuit court's failure to expressly address it

prevented him from presenting the issue on appeal to the First DCA (*id.*).

Respondent contends Petitioner failed to exhaust this claim, because his counsel failed to

argue error with respect to the lower court's adjudication of Ground Nine on appeal to the First DCA

(doc. 21 at 87–97).  Respondent contends Petitioner cannot now take a second appeal from the

denial of his Rule 3.850 motion; therefore, the claim is procedurally barred from federal review (*id.*

at 97–98).

The record demonstrates that the issue of counsel's use of an allegedly inadequate jury

instruction on involuntary intoxication was included in Petitioner's Ground Nine of his amended

rule 3.850 motion (*see* Ex. AA at 128).  The issue was litigated at the limited evidentiary hearing

as part of Ground Nine (*see* Ex. EE).  The state circuit court did not expressly address this issue in

its written opinion denying Petitioner's Rule 3.850 motion (*see* Ex. GG).  In Petitioner's initial brief

---

[13] A defense of voluntary intoxication was not available to Petitioner.  At one point in time, voluntary intoxication was a defense to specific intent crimes under Florida common law.  *See* Garner v. State, 28 Fla. 113, 9 So. 835 (Fla. 1891); Linehan v. State, 442 So. 2d 244, 246 (Fla. 2d DCA 1983), *approved on other grounds*, 476 So. 2d 1262 (Fla. 1985).  As of October 1, 1999, the Florida Legislature eliminated the defense.  *See* § 775.051, Fla. Stat. (1999).

to the First DCA, Petitioner's counsel did not argue error with respect the lower court's denial of Ground Nine (*see* Ex. JJ). Petitioner's failure to address this issue in his brief constituted an abandonment of the issue on appeal under Florida law. *See* Duest v. Dugger, 555 So. 2d 849, 851–52 (Fla. 1990) (holding that issues raised on appeal from order denying post-conviction relief were procedurally barred where petitioner received an evidentiary hearing on his Rule 3.850 motion and failed to fully brief and argue the points on appeal). Therefore, Ground Seven is procedurally defaulted. *See* Atwater v. Crosby, 451 F.3d 799, 810 (11th Cir. 2006) (holding that petitioner, who had received an evidentiary hearing on his Rule 3.850 motion, procedurally defaulted his right-to-testify claim when he failed to argue it in his initial brief on appeal from the denial order; raising it in his reply brief was not proper exhaustion); *see also, e.g.,* Cortes v. Gladish, 216 F. App'x 897, 899–900 (11th Cir. 2007) (stating that had the petitioner received an evidentiary hearing on his Rule 3.850 motion, his failure to address issues in his appellate brief would constitute a waiver of those issues, and they would be considered procedurally defaulted).

Petitioner argues the procedural default was caused by the state circuit court's failure to expressly address the issue in its written decision denying his Rule 3.850 motion (doc. 26 at 19–20). He contends Florida law provides that an aggrieved party must obtain an adverse ruling in the lower court to preserve an issue for appellate review (*id.*). He contends he filed a motion for rehearing in the circuit court, and included in the motion an argument that the court overlooked the issue of counsel's failure to present an adequate jury instruction on involuntary intoxication; however, the court denied his motion (*id.*).

The record confirms that Petitioner filed a pro se motion for rehearing in the Rule 3.850 proceeding, and he included in the motion an argument that the court overlooked the issue of counsel's failure to present an adequate jury instruction on involuntary intoxication (Ex. HH at 282). The state circuit court dismissed the motion as a nullity, because Petitioner was represented by counsel when he filed the motion (Ex. II). Petitioner's counsel could have filed a motion for rehearing seeking a ruling on this issue, but he did not. Petitioner failed to demonstrate that the circuit court's failure to expressly address the issue in the written order caused him to procedurally default the claim on appeal. Therefore, he failed to establish he is entitled to review of Ground Seven through the "cause and prejudice" portal.

Liberally construing Petitioner's pleadings as alleging he is entitled to review through the "miscarriage of justice" portal, based upon his claim of newly discovered evidence asserted in Ground Eight, *infra*, Petitioner failed to show he qualifies to proceed under this exception to the procedural bar. As previously discussed, to satisfy the miscarriage of justice exception, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." Schlup, 513 U.S. at 327. "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him." *Id.* Further:

> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare. To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.

*Id.*

In the instant case, Petitioner alleges in January of 2011, he discovered Mr. Cross had been denied relief in a Rule 3.850 proceeding, and this caused Petitioner to obtain copies of documents filed in Mr. Cross's criminal case (doc. 1 at 21–24; doc. 26 at 23–28). Petitioner alleges he discovered evidence that three days after Petitioner's trial, the State dismissed six charges against Cross, and subsequently dismissed another charge (*id.*). Petitioner also alleges three different sentencing score sheets were prepared for Mr. Cross, with some charges marked out and his sentencing points reduced (*id.*). Petitioner posits, "Why would the State be so adamant to nollo [sic] prosequias [sic] seven counts of a guilty man if no promises have been made" (doc. 1 at 22). Petitioner alleges on March 20, 2008, he submitted a "Chapter 119"[14] request to the State Attorney's Office for information regarding Mr. Cross's criminal case, but the State Attorney failed to include a copy of Cross's Rule 3.850 motion, which he had filed a month prior (*id.*). Petitioner alleges he also obtained a copy of a Rule 3.800(c) motion filed by Cross, which "clearly reveals how Cross cooperates with the State by testifying at Petitioner's trial . . . Cross was granted a five year sentence reduction on this motion." (*id.*). Petitioner argues this evidence demonstrates the State promised Mr.

---

[14] Chapter 119 of the Florida Statutes governs access to public records.

Cross leniency in his own criminal case in exchange for his testimony against Petitioner, which demonstrates that Mr. Cross's testimony to the contrary was false, and the State knew it was false. He alleges had the jury known of Mr. Cross's motivation to testify against Petitioner, there is a reasonable probability the result of his trial would have been different (doc. 1 at 24).

Mr. Cross's post-conviction motions and some pages of his sentencing scoresheet are part of the state court record (Ex. SS at 16–39). In Mr. Cross's Rule 3.850 motion, filed by counsel on May 1, 2008, Cross did not allege the <u>State</u> promised him anything in exchange for his testimony at Petitioner's trial; rather, he alleged <u>his defense counsel</u> promised him a probationary sentence if he pleaded guilty to the charges (*id.* at 16–26). Additionally, Mr. Cross's motion for a modification of sentence, filed by counsel in August of 2005, did <u>not</u> allege the State promised him anything in exchange for his testimony at Petitioner's trial (*id.* at 27–29). Moreover, the fact that the State announced nolle prosequi as to seven of the twelve counts against Mr. Cross after Petitioner's trial, and prepared several versions of Cross's sentencing scoresheet, does not suggest that at the time of Petitioner's trial, the State had promised Mr. Cross anything in exchange for his testimony. Petitioner failed to show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *See* <u>Schlup</u>, 513 U.S. at 327. Therefore, he is not entitled to federal review of Ground Seven.

     H.    <u>Ground Eight: "Newly discovered evidence where the State intentionally solicited [sic] and permitted false and misleading testimony; co-defendant Warren Cross willingly gave false testimony as to promises made to him which denied Petitioner his due process of law."</u>

As discussed *supra*, Petitioner alleges the prosecutor knowingly presented Mr. Cross's false testimony that he had not been promised anything by the State in return for his testimony, in violation of <u>Giglio v. United States</u>, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972) (doc. 1 at 21–24; doc. 26 at 23–28). Petitioner also contends the State violated <u>Brady v. Maryland</u>, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1953) by failing to provide a copy of Cross's Rule 3.850 motion when Petitioner submitted the "Chapter 119" request to the State Attorney's Office in March of 2008, while preparing his own Rule 3.850 (*id.*).

Respondent contends Petitioner asserted these claims in his second Rule 3.850 motion, filed February 1, 2011, and the state circuit court dismissed the motion as untimely and successive (doc.

21 at 103–04). Respondent states Petitioner appealed the decision to the First DCA, and the appellate court affirmed the lower court's decision (*id.*). Respondent contends the state court's application of an independent and adequate state procedural rule renders the claim procedurally barred from federal review (*id.* at 104–05).

The record reflects that Petitioner raised a <u>Giglio</u> claim in his second Rule 3.850 motion filed February 1, 2011 (Ex. SS). As cause for failing to file the motion sooner, Petitioner alleged his claim was based upon newly discovered evidence (*id.*). The state circuit court dismissed the motion as untimely and successive as follows:

Prior Motion Filed Pursuant to Rule 3.850

The Defendant filed his initial rule 3.850 motion on August 1, 2007, which was stricken in accordance with <u>Spera v. State</u>, 971 So. 2d 754 (Fla. 2007). The Defendant filed an amended motion for post-conviction relief on February 5, 2008. This motion was subsequently supplemented by the Defendant on July 10, 2008 and September 19, 2008. <u>Attachment 3</u>. After an evidentiary hearing, the motion was denied on September 18, 2009. <u>Attachment 3</u>. The First District Court of Appeal affirmed this Court's order denying post-conviction relief in 2010. <u>See</u> First District Court of Appeal case number 1D09-5508.

Timeliness

The Defendant was required under rule 3.850 to request post-conviction relief by October 10, 2008, as his conviction became final on October 10, 2006. <u>See</u> Fla. R. Crim. P. 3.850(b). To avoid the effect of this limitation on the basis of newly discovered evidence, the Defendant must demonstrate as a threshold requirement that the motion for relief was filed within two years of the time when evidence upon which avoidance of the time limitation is based could have been discovered through the exercise of due diligence. <u>See</u> <u>Bolender v. State</u>, 658 So. 2d 82, 85 (Fla. 1995).

Furthermore, to qualify as "newly discovered," the purported facts "must have been unknown by the trial court, by the party, or by counsel at the time of trial, and it must appear that defendant or his trial counsel could not have known them by the use of diligence." <u>Jones v. State</u>, 591 So. 2d 911, 916 (Fla. 1991). In addition, "in order to provide relief, the newly discovered evidence must be of such nature that it would *probably* produce an acquittal on retrial." <u>Id.</u>, at 915 (emphasis in original).

The Court finds that the instant motion is untimely. The evidence upon which avoidance of the time limitation is based is the post-conviction motion of the Defendant's co-defendant Warren Cross. This motion was filed on May 1, 2008.[FN

1:  A copy of this motion is also attached to the Defendant's instant motion for post-conviction relief.]  Attachment 4.  Accordingly, the instant motion was not filed within two years of the time when this evidence could have been discovered through the exercise of due diligence.  This information has been public record since May 1, 2008.  See Zeigler v. State, 632 So. 2d 48 (Fla. 1993); Demps v. State, 515 So. 2d 196, 198 (Fla. 1987).  The instant motion should be dismissed as untimely.

Successiveness

The prior post-conviction motion filed by the Defendant was adjudicated on the merits.[FN 2:  As the Fourth District Court of Appeal has explained, "[b]ecause a movant now has the opportunity to correct a pleading deficiency during the initial proceedings on a motion, the rule announced in Spera has supplanted the caselaw that permitted successive motions if a prior motion was not determined on the merits." Oquendo v. State, 2 So. 3d 1001, 1005 (Fla. 4th DCA 2008).  Indeed, '[b]y giving the defendant the opportunity to amend prior to the entry of a final order, the final order can be a disposition on the merits for all claims that were or could have been raised in that motion, thereby limiting most defendants to one appeal and to the right to a successive motion only in extraordinary cases." Lawrence v. State, 987 So. 2d 157, 158–159 (Fla. 2d DCA 2008).  Attachment 3.  The basis of the Defendant's instant claim is a motion that was filed by Warren Cross[FN 3:  The record reflects that Mr. Cross was represented by counsel.  Attachment 4.] on May 1, 2008, at the time when the Defendant was actively litigating a motion for post-conviction relief.  In fact, the Defendant filed supplements to his 3.850 motion on July 10, 2008 and September 19, 2008.  Attachment 3.  Accordingly, the instant motion contains no claims that could not have been raised in the Defendant's prior post-conviction proceedings.  Because it constitutes an abuse of procedure, the Court finds that the instant motion is also subject to dismissal as successive.

(Ex. UU).  Petitioner appealed the decision to the First DCA (Ex. YY).  The First DCA affirmed per curiam (Ex. AAA).

Rule 3.850(f) provides, in relevant part, that a second or successive motion may be dismissed "if new and different grounds are alleged, [and] the judge finds that the failure of the movant or the attorney to assert those grounds in a prior motion constituted an abuse of the procedure governed by these rules."  Fla. R. Crim. P. 3.850(f).  In the instant case, the state court determined the Rule 3.850 motion was barred by Rule 3.850(b) and (f), because Petitioner failed to show a sufficient justification for not raising his claim within the time limit set forth in the rule or in his prior Rule 3.850 motion that was adjudicated on the merits.  This was a clear and express statement that the

court was relying on state procedural rules to resolve Petitioner's claim. *See* <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803, 111 S. Ct. 2590, 1294, 115 L. Ed. 2d 706 (1991) (although a procedural bar may be removed if the last state court to be presented with a claim ignores the bar and reaches the merits, when the trial court's denial of a claim on procedural grounds is affirmed by the appellate court per curiam and without opinion, the appellate decision is deemed to have affirmed the procedural bar). Additionally, the state court's decision on the procedural issues rested entirely on state law grounds, namely, Rule 3.850(b) and (f), and these rules are firmly established and regularly followed by Florida courts. *See* Fla. R. Crim. P. 3.850(b) and (f); *see also* <u>Frazier v. State</u>, 898 So.2d 1183, 1183–84 (Fla. 3d DCA 2005) (barring as successive claims that could have and should have been made in previous post-conviction motion); <u>Washington v. State</u>, 876 So.2d 1233, 1234 (Fla. 5th DCA 2004) (same). Therefore, Ground Eight is procedurally barred from federal review unless Petitioner satisfies the "cause and prejudice" or "miscarriage of justice" exception to the procedural bar.

Petitioner failed to show he could not have, with due diligence, obtained copies of Mr. Cross's postconviction motions and drafts of his sentencing scoresheet prior to September 18, 2009, the date the state circuit court disposed of Petitioner's first post-conviction motion.[15] Further, Petitioner has not alleged or shown that an external impediment prevented him from obtaining this information prior to September 18, 2009. Therefore, he failed to demonstrate cause for his procedural default. Moreover, as discussed *supra*, he failed to show he qualifies for review under the fundamental miscarriage of justice exception to the procedural bar. Therefore, he is not entitled to federal review of Ground Eight.

## VI.    CERTIFICATE OF APPEALABILITY

As amended effective December 1, 2009, § 2254 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing

---

[15] The state court found as a matter of state law that Petitioner could have amended his postconviction motion at any time prior to the court's final disposition of the motion.

required by 28 U.S.C. § 2253(c)(2)."  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  Rule 11(b), Rules Governing Section 2254 Cases.

The undersigned finds no substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2); <u>Slack v. McDaniel</u>, 529 U.S. 473, 483–84, 120 S. Ct. 1595, 1603–04, 146 L. Ed. 2d 542 (2000) (explaining how to satisfy this showing) (citation omitted).  Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of new Rule 11(a) provides:  "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.      That the petition for writ of habeas corpus (doc. 1) be **DENIED**.

2.      That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this <u>4th</u> day of March 2013.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M.  TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**



<u>**NOTICE TO THE PARTIES**</u>

**Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).**